DA 09-0091

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 214

STATE OF MONTANA,

       Plaintiff and Appellee,

v.

BRIAN HAYDEN ALLEN,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DC 08-022
Honorable David Rice, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Joslyn Hunt, Chief Appellate Defender; Taryn S. Hart, Tammy A.
Hinderman, Gem Koan Mercer (argued), Assistant Appellate Defenders,
Helena, Montana

       For Appellee:

              Steve Bullock, Montana Attorney General; Matthew T. Cochenour
(argued), Assistant Attorney General, Helena, Montana

              Gina Dahl, Hill County Attorney, Havre, Montana

Orally Argued:  May 3, 2010
Submitted:  May 4, 2010
Decided:  October 6, 2010

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 A Hill County jury convicted Brian Hayden Allen (Allen) of two counts of assault with a weapon and one count of criminal endangerment for beating Louis Escobedo (Escobedo) with a pistol and firing the pistol in a residential neighborhood. Allen appeals the conviction, alleging that the District Court committed reversible error by denying his challenge for cause of a prospective juror, denying his motion to suppress recorded telephone conversations, and denying his request for a jury instruction on accomplice testimony. We reverse and remand for a new trial.

¶2 We address the following issues on appeal:

¶3 *1. Whether the District Court abused its discretion when it denied Allen's challenge for cause.*

¶4 *2. Whether the District Court erred when it denied Allen's motion to suppress a warrantless recording of a telephone conversation between Allen and a confidential informant.*

¶5 *3. Whether the District Court abused its discretion when it denied Allen's request for a jury instruction on accomplice testimony.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶6 In February 2008 the State charged Allen with four counts of assault with a weapon and one count of criminal endangerment, all felonies. The State later added a count of felony intimidation. According to the supporting affidavit, the charges (save for

2

the first count of assault with a weapon, which was eventually severed and then dismissed) arose from an incident that occurred on the night of January 27, 2008, in Havre, Montana.

¶7     According to the allegations, on that night Allen used a pistol to threaten and then bludgeon (or, "pistol-whip") Escobedo.  The affidavit sketched the following chronology of events.  Allen, getting increasingly drunk at the Shanty Bar in Havre, dialed Kristin Golie (Golie) (who was, unbeknownst to Allen, a police informant, working with the local drug task force) to chauffer him to the trailer house where Escobedo was babysitting his nieces.  Upon arriving at the trailer house, Allen and Golie somehow (the affidavit glosses over this) drew Escobedo into the backseat of the car.  Allen pointed the pistol to Escobedo's face and demanded money owed to him.  Escobedo did not have the money, so Allen struck him repeatedly in the head with the pistol, causing him briefly to lose consciousness.  During the fray, Allen fired the pistol, shooting a hole through the car's rear window.  Eventually Escobedo was released, and Allen and Golie returned to the Shanty briefly before retiring to their separate residences for the evening.  At numerous points during the incident, Allen also allegedly pointed the gun at Golie and threatened to kill her.  At trial Allen testified and admitted to this basic storyline, with two critical exceptions: (1) Allen denied using or discharging a gun during the altercation, and (2) Allen denied ever threatening Golie.

¶8     As mentioned above, Golie was a confidential informant (CI), and she aided a law enforcement investigation of Allen.  As a CI, Golie surreptiously recorded her cell

3

phone conversations with Allen. Law enforcement did not obtain a search warrant to record the conversations at issue. Before trial, Allen moved (pursuant to *State v. Goetz*, 2008 MT 296, 345 Mont. 421, 191 P.3d 489) to suppress these warrantless recordings, arguing that they were obtained in violation of his rights under the Montana Constitution to privacy and to be free from unreasonable searches and seizures. The State opposed the motion, responding that no constitutionally cognizable search had actually occurred because Allen had no expectation of privacy in his cell phone calls. In fact, the State proclaimed that "one can never have an expectation of privacy in a phone conversation," since existing technology makes it possible for third-parties to eavesdrop on telephone conversations. Further, the State added, society is not willing to recognize as reasonable an expectation of privacy in phone conversations.

¶9 The District Court held a hearing on the motion. Golie and Allen testified. Golie testified that she was a CI involved in an investigation of Allen and that she recorded calls with Allen at the behest of law enforcement. Golie was usually alone during the calls, but occasionally law enforcement or family and friends were present. During the phone calls, Golie could also hear voices and other sounds in the background, though the only voice she could identify was that of Allen's wife. Allen in turn testified that he was unaware that Golie was recording their phone conversations and that he believed the conversations were private. Allen never heard other background voices when he spoke with Golie. Allen also testified that his cell phone would alert him if the person on the other end was using the speaker phone and that he could tell by the echo whether

4

someone was listening on an extension line. Thus, he believed he could detect whether any third parties were overhearing his telephone calls. (Although the testimony indicated that numerous calls were recorded, only one of the calls is at issue.)

¶10 The District Court denied Allen's motion. The court observed that Allen "had a subjective expectation of privacy in the cell phone calls he made to Golie and the calls she made to him." Nevertheless, the court concluded that society is unwilling to recognize as reasonable an expectation of privacy in telephone conversations. Unlike face-to-face conversations, the court reasoned, a party to a telephone conversation can never be sure who may be listening to the conversation on the other end. The court also noted Golie's testimony that Allen was apparently in a public setting during portions of his call to her because she could hear voices in the background. Thus, "[w]hether he made the calls or received them from Golie, it was his choice to use the words he did and that left him at risk that someone would hear them or Golie would be recording them." Accordingly, the court concluded that the State could present the recordings at trial because no search requiring a warrant had occurred.

¶11 The case went to trial in October 2008. During voir dire (jury selection) the parties disputed whether the court should eliminate a prospective juror, Dennis Morgan, on account of his being partial to the prosecution. Upon the prosecutor's initial inquiry, Morgan declared that he had made up his mind about the case because he had read the newspaper, he considered himself "a law-and-order sort of person," and he knew the police officers involved in the case both professionally and personally.

5

¶12    The prosecutor attempted to rehabilitate Morgan and explained the need for jurors to hear all the evidence before deliberating.  She asked, "So if I don't prove the case are you saying that you're still going to find him guilty?"  Morgan responded that he would not.  But under further examination by the prosecution and the defense, Morgan said that he would be "a very impatient juror" if the trial lasted more than two days and that, if it did last more than two days, he would summarily convict Allen to—as the prosecutor put it—"hurry up and get out of here."  Morgan also repeated that he would be "a great juror" for the prosecution, that he was "very law and order," and that he "kn[ew] all the officers."  When the defense had its turn to question the jurors, Allen's counsel immediately asked Morgan if he had serious doubts about his ability to be fair in the case. Morgan confirmed that he did.

¶13    Defense counsel then challenged Morgan for cause, asking the court to remove him from the jury pool.  The prosecution resisted, "The panelist [h]as indicated that he will listen to the evidence before making his determination and he's already indicated that he's not automatically going to find guilt or innocence until then."  The court denied the challenge, explaining, "Mr. Morgan has said that he had some biases towards that, but I don't think he indicated that he couldn't be fair and listen to the evidence."  Allen subsequently used a peremptory challenge to remove Morgan from the panel and exhausted his peremptory challenges.

¶14    After the jury was selected, the parties gave opening statements and then presented evidence and testimony.  Witnesses called by the State during its case in chief included

6

Escobedo, Golie, the bartender (Jodi Pickens) and a patron (Shane Munyan) at the Shanty Bar on the evening of the assault, one of Allen's friends (Timothy Vigliotti), and various members of the Havre Police Department. During Golie's testimony, the State introduced the recorded conversation between Golie and Allen that was the subject of Allen's motion to suppress. The State's witnesses described a story that closely paralleled the account from the State's charging documents—that Allen attacked Escobedo with a gun and threatened Golie. Allen, testifying in his own defense, agreed that he had attacked Escobedo in Golie's car, while Golie looked on. But Allen steadfastly denied using a gun in the attack and denied threatening Golie at any point.

¶15 Also in dispute was whether Golie was an accomplice to the attack. Golie testified at trial that though she agreed to drive Allen to meet Escobedo, she believed that Allen intended only to acquire narcotics from Escobedo and then go home. Pickens, however, testified that Golie was instigating Allen to "go take care of business at Louis's." Allen also testified that Golie knew he intended to assault Escobedo: "She was all for it. Absolutely. She knew exactly what was going on." Later, on cross-examination Allen was more equivocal, testifying:

> She knew the situation. She knew—she didn't know that that's why I wanted to go there, because I was mad and I wanted to assault him. She didn't know that at the time, but she knew I wanted to go to Louis's.
>
> . . . .
>
> I called her to come and get me and if he didn't have my marijuana or my money, I was going to beat him up.

7

The parties agreed that Golie drove Allen to meet Escobedo and, upon arriving, beckoned Escobedo to approach the car. The witnesses (Allen, Escobedo, and Golie) also testified that Golie immediately began scolding Escobedo for talking to others about her. Escobedo further testified (but Golie denied) that Golie threatened him, saying that "this stuff [talking about her] could get me killed and stuff like that." After the assault, Golie drove Allen back to the Shanty bar.

¶16 Following presentation of the witnesses, the jury left the courtroom, and the parties and the District Court settled the jury instructions. The only instruction at issue on appeal is "Defendant's Proposed Instruction No. 3," regarding the testimony of Golie. The instruction, based on Montana Criminal Jury Instruction 1-112, read:

> Testimony has been presented that the witness Kristen Golie may be legally accountable for the offense charged in this case. In this respect, you are to be guided by the following rules of law:
>
> 1. A person is legally accountable for the conduct of another when either before or during the commission of an offense with the purpose to promote or facilitate such commission, she solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense.
>
> 2. It is a question of fact for the jury to determine from the evidence and from the law as given you by me whether or not in this particular case the witness Kristen Golie is or is not legally accountable within the meaning of the law.
>
> 3. The testimony of one legally accountable ought to be viewed with distrust.
>
> 4. A conviction cannot be had on the testimony of one legally accountable unless it is corroborated by other evidence which in itself, and without the aid of the testimony of the person legally accountable, tends to

8

connect the Defendant with the commission of the offense or offenses, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

¶17 The District Court questioned the propriety of this instruction, given that there was testimony, in addition to that of Golie, corroborating the charged offenses against Escobedo. The State objected that there was insufficient evidence that Golie was legally accountable (i.e., an accomplice). Ultimately, the court denied the instruction, reasoning that it could confuse the jurors and also that it was improper since Allen had admitted to attacking Escobedo. The court said that Allen was free to challenge the credibility of Golie in his closing argument.

¶18 The parties then presented closing arguments. The State argued that it had met its burden on each count. The defense tried to raise doubts. During its rebuttal, the State referred extensively to incriminating statements made by Allen in the conversation that Golie had secretly recorded. After nearly three hours of deliberation, the jury returned a verdict, convicting Allen of two counts of assault with a weapon for attacking Escobedo and one count of criminal endangerment for firing the pistol in the trailer court. The jury found Allen not guilty of assaulting Golie with a weapon or intimidating her. At a subsequent sentencing hearing, the District Court sentenced Allen to thirty years in prison. The court also awarded restitution to Escobedo and Golie, and recommended myriad conditions in the event Allen is paroled.

¶19 Allen appeals.

**STANDARD OF REVIEW**

¶20   We review for abuse of discretion a district court's denial of a challenge for cause of a veniremember (prospective juror). *State v. Robinson*, 2008 MT 34, ¶ 7, 341 Mont. 300, 177 P.3d 488.  "If a district court abuses its discretion in denying a challenge for cause, the defendant uses a peremptory challenge to remove the juror, and also uses all of his peremptory challenges, we will reverse the judgment and order a new trial." *Id.*

¶21   We review a district court's denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether its interpretation and application of the law is correct. *State v. Goetz*, 2008 MT 296, ¶ 9, 345 Mont. 421, 191 P.3d 489.

¶22   Generally, we review jury instructions in a criminal case to determine if, when taken as a whole, they fully and fairly instruct the jury on the applicable law. *State v. Dewitz*, 2009 MT 202, ¶ 66, 351 Mont. 182, 212 P.3d 1040.  However, under § 26-1-303(4), MCA, it is error for a district court to fail to give an instruction on accomplice testimony when (1) an accomplice gives direct testimony, (2) the defendant requests such an instruction, and (3) the instruction is not inconsistent with the defendant's claim of innocence. *See State v. Hall*, 2003 MT 253, ¶ 30, 317 Mont. 356, 77 P.3d 239; *State v. Johnson*, 257 Mont 157, 163, 848 P.2d 496, 499 (1993).

## DISCUSSION

¶23   *1. Whether the District Court abused its discretion when it denied Allen's juror challenge for cause.*

¶24 In denying Allen's challenge for cause, the District Court reasoned that prospective juror Morgan "said that he had some biases towards that, but I don't think he indicated that he couldn't be fair and listen to the evidence." This was based on Morgan's negative response to the prosecutor's question whether Morgan would convict Allen if the prosecutor did not prove the case. On appeal the State argues that this was a permissible discretionary determination by the District Court to which we should defer. We disagree.

¶25 In a criminal trial, a party may challenge a prospective juror for "having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party." Section 46-16-115(2)(j), MCA. This rule is rooted in the fundamental right of criminal defendants to be tried by an impartial jury. *State v. Golie*, 2006 MT 91, ¶ 29, 332 Mont. 69, 134 P.3d 95; U.S. Const. amend. VI; Mont. Const. art. II, § 24. A district court abuses its discretion if it fails to grant a challenge for cause when a juror's statements during voir dire raise serious doubts about the juror's ability to be fair and impartial. *Golie*, ¶¶ 28, 30; *State v. Good*, 2002 MT 59, ¶ 53, 309 Mont. 113, 43 P.3d 948; *see also State v. Crosley*, 2009 MT 126, ¶ 32, 350 Mont. 223, 206 P.3d 932 (citing cases), *abrogated in part on other grounds*, *State v. Robinson*, 2010 MT 108, ¶ 12 n. 1, 356 Mont. 282, ___ P.3d ___.

¶26 In reality, few people are entirely impartial regarding criminal matters, and a district court is not required to remove a prospective juror for cause if the juror

convincingly affirms his ability to lay aside any misgivings and fairly weigh the evidence. *State v. Robinson*, 2008 MT 34, ¶ 10, 341 Mont. 300, 177 P.3d 488. Whether a prospective juror can do this is a determination that a district court makes based on the totality of the circumstances. *Id.* at ¶ 8. District courts, able to observe the disposition of prospective jurors, are best placed to make this qualitative determination, for which we grant them a degree of deference. *State v. Hart*, 2009 MT 268, ¶ 13, 352 Mont. 92, 214 P.3d 1273. To guide district courts in evaluating possible impartiality, we have observed that a prospective juror's spontaneous and unprompted statements are the most meaningful. *State v. Braunreiter*, 2008 MT 197, ¶ 9, 344 Mont. 59, 185 P.3d 1024. A district court or litigant may ask open-ended questions to allow a veniremember to clarify initial, suspect statements and thereby allay concerns about impartiality. *Robinson*, ¶ 11. Conversely, "coaxed recantations" in response to leading questions by counsel "fail to demonstrate" the impartiality required of jurors. *Braunreiter*, ¶ 11.

¶27 Here, Morgan's statements during voir dire, viewed as a whole, raised serious doubts about his ability to be fair and impartial. When the prosecutor asked him if he had made up his mind about the case, Morgan responded that he had. Morgan explained that he had read newspaper accounts of the incident, that he was a "law-and-order sort of person," and that he would be partial to testimony by police officers involved in the case, whom he knew professionally and personally. Morgan's spontaneous explanation of why he had made up his mind in the case and of why he would be partial carries significant weight. Morgan also expressed an unwillingness to consider all the evidence before

12

reaching a conclusion about the case and eventually agreed with Allen's counsel that he had serious doubts about his ability to be fair in the case.

¶28   Further, and contrary to the State's argument, subsequent attempts by the prosecution to rehabilitate Morgan failed to convincingly demonstrate Morgan's ability to be impartial. After Morgan voiced his initial misgivings about his ability to be impartial, the prosecutor asked, "So if I don't prove the case are you saying that you're still going to find him guilty?" And Morgan responded, "No. No, I wouldn't." This, the quintessential coaxed recantation, was inadequate to rehabilitate Morgan and show that he could lay aside his bias. In effect, the prosecutor asked Morgan if he would convict Allen without some showing of evidence by the State. Morgan could realistically be expected only to answer this leading question negatively, as he did. *See Good*, ¶¶ 51, 55 (indicating unlikelihood that prospective juror would challenge judge's loaded question).

¶29   Morgan's subsequent statements were more telling. He continued to emphasize his pro-police bias, which he evidently could not set aside ("[I] guess I believe in our law enforcement community." "[I]'m very law and order."). The implication of these statements is that Morgan would give disproportionate weight to any law enforcement testimony, to the detriment of any testimony from the defense. Additionally, in response to continued questioning by the prosecutor, Morgan repeatedly displayed a disinclination to consider all the evidence presented. He stated that would be a "very impatient juror if this thing lasts over two days." Then, after the prosecutor asked him if he would find Allen "guilty because you want to hurry up and get out of here," Morgan responded, "If it

13

lasts more than two days, yes." Finally, the prosecutor probed, "You understand that you won't get to deliberate until we are done with the case?" Morgan, making no concession, replied, "And again, if it lasts more than two days, that's going to be a problem." Apparently exasperated, the prosecutor conceded ("Okay. Okay.") and moved on to other jurors. The prosecutor's attempts at rehabilitation were to no avail.

¶30   The District Court's failure to grant Allen's challenge for cause was an abuse of discretion. Because Allen used a peremptory challenge to remove Morgan and then exhausted his peremptory challenges, we reverse and remand for a new trial. *Robinson*, ¶ 7.

¶31   Because the remaining issues may arise on retrial, we address them below. *State v. Barosik*, 2009 MT 260, ¶ 3, 352 Mont. 16, 214 P.3d 776.

¶32   ***2. Whether the District Court erred when it denied Allen's motion to suppress a warrantless recording of a telephone conversation between Allen and a confidential informant.***

¶33   At trial the State presented the warrantless recording of a phone conversation between Allen and Golie that Golie had recorded at the behest of law enforcement. Allen maintains that this was error and that the recording should have been suppressed.

¶34   The State argues on appeal that under existing precedent, police need not obtain a warrant to record telephone conversations, and consequently, that the District Court properly denied Allen's motion to suppress. The State further contends that even if the Court reconsiders this precedent, the District Court's denial of Allen's motion was still

proper because (1) a constitutionally cognizable search did not occur and (2) if one did, no warrant was required in light of Golie's consent.

*A.    Evolution of Jurisprudence on Electronic Monitoring by Police*

¶35    Initially we must determine whether to revisit our jurisprudence regarding the warrantless electronic monitoring and recording of telephone conversations by law enforcement with the consent of one party (or, "warrantless participant recording"). A line of cases, beginning with *State v. Coleman*, 189 Mont. 492, 502-03, 616 P.2d 1090, 1096 (1980), and continuing through *State v. Jones*, 2008 MT 440, ¶¶ 10-12, 347 Mont. 512, 199 P.3d 216, has condoned warrantless participant recording. Allen contends that the seminal case, *Coleman*, was wrongly decided and should therefore be overruled, along with its progeny. We agree that the reasoning in *Coleman* was flawed and that, in light of *Goetz*, we should reassess our jurisprudence on this topic.

¶36    To critique *Coleman*, we must first examine two earlier cases involving electronic monitoring: *State v. Brackman*, 178 Mont. 105, 582 P.2d 1216 (1978), *overruled*, *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988), *overruled in part*, *Goetz*, ¶ 24, and *State v. Hanley*, 186 Mont. 410, 608 P.2d 104 (1980). In *Brackman*, police—acting without a warrant—monitored and recorded a face-to-face conversation between the defendant and a police informant in a public parking lot by placing an electronic monitoring device on the informant. *Brackman*, 178 Mont. at 107, 582 P.2d at 1217. The State subsequently charged the defendant with intimidation. *Id.* In response to a motion in limine by the defendant, the district court suppressed the taped conversations for having been obtained

15

in violation of the defendant's constitutional rights. *Id.* On appeal, we considered whether warrantless participant monitoring and recording violates the United States or Montana Constitutions. *Id.* at 108, 582 P.2d at 1217.

¶37 We held that under the plurality opinion in *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122 (1971) (plurality), such surveillance does not violate the United States Constitution. *Brackman*, 178 Mont. at 117, 582 P.2d at 1222. However, we further concluded that warrantless participant recording of a face-to-face conversation does violate the Montana Constitution. *Id.* We indicated that the express right to privacy ("Article II, Section 10" or "Section 10") and the right to be free from unreasonable searches ("Article II, Section 11" or "Section 11") of the Montana Constitution, read in conjunction, provide greater protection to people in Montana than does the Fourth Amendment of the United States Constitution. *Brackman*, 178 Mont. at 113-17, 582 P.2d at 1220-22; *accord Goetz*, ¶ 14; *see also* U.S. Const. amend. IV; Mont. Const. Art. II, §§ 10-11. We reasoned that effective law enforcement is not hindered by requiring police to obtain a warrant prior to conducting participant recording. *Brackman*, 178 Mont. at 115-16, 582 P.2d at 1221-22. We also agreed with the reasoning of Justice Harlan's dissent in *White* that electronic monitoring of a conversation is a greater invasion of privacy than allowing police to merely use a confidential informant (without a monitoring or recording device) and that, consistent with "the goals and values of our political system," such surveillance should be subject to warrant requirements, not merely

the self-restraint of law enforcement. *Id.* at 115, 582 P.2d at 1221 (paraphrasing *White,* 401 U.S. at 785, 91 S. Ct. at 1143 (Harlan, J., dissenting)).

¶38 Two years later we decided *Hanley.* In that case an undercover police officer—again, acting without a warrant—recorded a telephone call with the defendant and two other parties in which they arranged a drug sale. *Hanley,* 186 Mont. at 412, 608 P.2d at 105-06. The police then secured a warrant for the undercover officer to electronically monitor and record the actual sale. *Id.* at 412, 608 P.2d at 106. Following the sale, the defendant was arrested and charged with the criminal sale of dangerous drugs. *Id.* at 413, 608 P.2d at 106. The defendant moved to suppress the recorded telephone conversation and all other evidence, which he argued was obtained as a result of the telephone recording. *Id.* The district court denied the defendant's motion. *Id.* At trial the district court refused to admit the warrantless recording of the telephone conversation, but allowed the prosecution to admit the recordings of the actual drug sale, as well as the drugs seized. *Id.* at 413, 417-18, 608 P.2d at 106, 108. After being convicted, the defendant appealed, *inter alia,* the district court's denial of his motion to suppress. *Id.* at 413, 608 P.2d at 106.

¶39 The relevant issue on appeal was whether the district court correctly denied the motion to suppress. *Id.* at 413, 608 P.2d at 106. We found no error and affirmed. *Id.* at 422-23, 608 P.2d at 111. In reaching this conclusion, we first rejected the defendant's argument that the recording of the drug sale (for which the police had obtained a warrant) and the drugs seized were the rotten fruit of an illegal search and therefore inadmissible.

17

*Id.* at 418, 608 P.2d at 108-09; *see also Wong Sung v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416 (evidence obtained as direct or indirect result of unconstitutional search is inadmissible). This was because the police relied, not on the warrantless telephone recording, but on the testimony of the undercover agent to obtain the warrant. *Id.* at 418, 608 P.2d at 108-09. Thus, the undercover agent was an independent source of the information necessary to obtain the warrant, obviating the warrantless telephone recording. *Hanley*, 186 Mont. at 422, 608 P.2d at 110. For this same reason, we concluded that *Brackman* (and, thus, analysis under the Montana Constitution) did not apply. *Id.* at 418, 608 P.2d at 109. Nevertheless, as a nod toward *Brackman*, we observed that "if the police had relied on the recorded tape of the telephone conversation to obtain evidence against appellant, the argument could be made that such evidence should have been suppressed." *Id.* at 418, 608 P.2d at 108.

¶40 The defendant apparently also challenged the legality of the recording of the drug sale (for which the state had a warrant) under federal law (Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522). *See Hanley*, 186 Mont. at 419, 608 P.2d at 109 ("The next issue raised is whether federal statutes prohibit the monitoring and tape recording of a conversation in which one of the participants consents . . . ."). We rejected the defendant's challenge, observing that 18 U.S.C. § 2511(2)(c) expressly permits participant recording. *Hanley*, 186 Mont. at 419-20, 608 P.2d at 109. We further cited the rationale of the plurality in *White* (though it was not a statutory analysis), which also condoned such police recording. *Id.* at 420, 608 P.2d at 109. Next

18

(apparently addressing the legality of the recording under the United States Constitution) we obliquely noted that because the defendant "could have no reasonable expectation that the person he was dealing with in this drug-related matter was not in fact an informer," and because the police had obtained a warrant, in any case, to record the drug sale, "no interest legitimately protected" by the United States Constitution was involved. *Id.* at 421, 608 P.2d at 110. Finally we added, without explanation, that such monitoring was also permissible under § 45-8-213(1)(c), MCA. Thus, we resolved the issue without addressing the protections of the Montana Constitution.

¶41 That same year we decided *Coleman.* That decision involved consolidated cases, only the second of which is relevant to the present analysis. In that case, police monitored and recorded a telephone call between the defendant and a consenting CI. *Colman*, 189 Mont. at 502, 616 P.2d at 1095. This apparently exceeded the scope of the warrant. *Id.* The defendant was subsequently arrested and convicted of possession of dangerous drugs. *Id.* at 498, 616 P.2d at 1093. On appeal, the defendant argued that the recording of the telephone conversation violated his right to privacy under the Montana Constitution. *Id.* at 502, 616 P.2d at 1096. In the space of one paragraph, we rejected this argument on the basis of *Hanley*—even though *Hanley* had avoided the question of the legality under the Montana Constitution of warrantless participant monitoring. *Id.* at 502-03, 616 P.2d at 1096. We interpreted *Hanley* as holding "that interception of telephone conversations by police officers is legal if one of the parties to the conversation consents." *Id.* Next we distinguished *Brackman*, reasoning that unlike the participants in

19

that case (who conversed face-to-face in an open parking lot), a party to a telephone conversation cannot have a reasonable expectation of privacy because he cannot see the party on the other end and cannot be sure whether the conversation is being overheard. *Id.* at 502-03, 616 P.2d at 1096. We then abruptly concluded, "Neither the Montana nor the federal constitution prohibits such monitoring where one of the participants consents." *Id.* at 503, 616 P.2d at 1096.

¶42 The difficulties with this analysis are apparent, even before considering the subsequent ruling in *Goetz*. First, the *Coleman* Court cited (as the State here recognizes) the analysis in *Hanley* of federal statutes as the controlling analysis under the Montana Constitution. The *Coleman* Court then repeated this mistake when it cited 18 U.S.C. § 2511(2)(c) to support its conclusion that the Montana Constitution does not prohibit warrantless consensual participant monitoring. Finally, we did not elaborate the questionable (but categorical) assertion that one can have no reasonable expectation of privacy in any communications where one cannot see the other participant.

¶43 Despite the opinion's analytical shortcomings, we cited *Coleman* favorably twice in the 1980s. In *State v. Canon*, 212 Mont. 157, 162-63, 687 P.2d 705, 707-08 (1984), we affirmed a district court's denial of a motion to suppress a warrantless recording of a telephone conversation between the defendant and a consenting CI. Without independent analysis, we cited the abovementioned paragraph from *Coleman* and concluded: "We hold that the . . . telephone tapes were properly admitted in evidence." *Id.* at 162-63, 687 P.2d at 708. Four years later, in *State v. Brown*, 232 Mont. 1, 6-7, 755 P.2d 1364, 1368

20

(1988), *overruled in part*, *Goetz*, ¶ 24, we again addressed the issue of warrantless participant monitoring. There, citing *Hanley*, *Coleman*, and *Canon*, we announced that consistent with the Montana Constitution, "if one party to a telephone conversation freely consents, the conversation can be electronically monitored and recorded without a warrant, and the evidence obtained is admissible in a subsequent criminal trial." *Id.* at 7, 755 P.2d at 1368.[1]

¶44 We conclude that the weak analytical underpinnings of *Coleman* do not survive our landmark ruling in *Goetz*. The facts in *Goetz* resemble those of the abovementioned cases. Police surreptitiously and without a warrant monitored and recorded conversations between the defendants and CIs, who were outfitted with electronic recording devices. *Goetz*, ¶¶ 5, 7. One conversation took place in one defendant's home, and another, in the other defendant's car. *Id.* After the defendants were arrested and charged for distributing dangerous drugs, both moved to suppress evidence obtained from the electronic monitoring. *Id.* at ¶¶ 6, 8. The district court denied the motions, and the defendants then pled guilty (reserving their rights to appeal) and appealed the denial of the motions to

---

[1] The Dissent incorrectly asserts that *Hanley*, *Jones*, and *State v. Solis*, 214 Mont. 310, 693 P.2d 518 (1984), held that warrantless participant monitoring is permissible under the Montana Constitution. Dissent, ¶ 150. However, as mentioned above, the Court in *Hanley* declined to address the legality of warrantless participant monitoring under the Montana Constitution. In *Solis*, the Court actually rejected the argument that warrantless participant monitoring of face-to-face conversations is constitutionally permissible with the consent of one party. *Solis*, 214 Mont. at 315-320, 693 P.2d at 520-23 (plurality); *Solis*, 214 Mont. at 320, 693 P.2d at 523 (Sheehy, Haswell, Weber, JJ., specially concurring). Indeed, foreshadowing today's ruling, the plurality in *Solis* recognized that *Coleman* and *Cannon* "may have gone farther than the Constitutional Convention delegates intended." *Id.* at 318, 693 P.2d at 522 (plurality). Finally, in *Jones*, the Court declined to address the merits of the appellant's constitutional challenge on account of inadequate briefing; thus, there was no constitutional holding. *Jones*, at ¶¶ 10-12.

suppress. *Id.* On appeal we considered whether warrantless participant recording of face-to-face conversations with CIs violated the defendants' constitutional rights under Section 10 and Section 11, despite the CIs' consent to the monitoring. *Id.* at ¶ 3.

¶45 We first addressed ostensibly conflicting precedent in *Brown* and *Solis* on the stated issue. *Goetz*, ¶¶ 15-24. We determined that since there was not a majority of the Court addressing the protections of the Montana Constitution in *Solis*, it was not controlling precedent. *Id.* at ¶ 18. However, we also declined to apply the rule from *Brown*, which had overruled *Brackman* in part and held that police need not obtain a warrant to monitor and record an in-person conversation if one party to the conversation consents. Instead, we concluded that *Brown* offered "little, if any, guidance" because of its reliance on federal jurisprudence in interpreting Section 10 (right to privacy) and Section 11 (right to be free from unreasonable searches and seizures) of the Montana Constitution. *Id.* at ¶ 24. Accordingly, we overruled *Brown* and examined "anew" the issue of warrantless electronic monitoring under the provisions of the Montana Constitution. *Id.* We then engaged in a three-part analysis, giving much weight to the individual's right to privacy and the concerns about privacy expressed by the delegates at the Montana Constitutional Convention. *See id.* at ¶¶ 28-54. Ultimately, we concluded that the recordings were warrantless searches that violated Sections 10 and 11, and that the district court erred in denying the defendants' motions to suppress. *Id.* at ¶ 54.

¶46 Here, as in *Goetz*, we find our existing precedent on the dispositive issue wanting. Accordingly, we will address anew whether the surreptitious, warrantless participant

22

recording of Allen's telephone conversation with Golie violated Sections 10 and 11. *Coleman*, like *Brown*, analyzed this issue without giving any particularized consideration to the unique provisions of the Montana Constitution and merely adopted a rule identical to the federal interpretation of the Fourth Amendment of the United States Constitution. *Coleman*, 189 Mont. at 502-03, 616 P.2d at 1096. No case following *Coleman* has provided the analysis of the Montana Constitution that was lacking in *Coleman*. *See Jones*, ¶¶ 9-12, *Brown*, 232 Mont. at 6-7, 755 P.2d at 1368; *Canon*, 212 Mont. at 162-63, 687 P.2d at 707-08. Furthermore, as mentioned above, *Coleman* misread *Hanley*, which avoided analyzing the Montana Constitution, and cited a federal statute to support its interpretation of the Montana Constitution. *Coleman*, 189 Mont. at 502-03, 616 P.2d at 1096. As such, we cannot accept *Coleman* as the final word on the scope of the fundamental rights under the Montana constitution.

### B. Analysis under Goetz

¶47 The Montana Constitution expressly protects the right to privacy of people in this state: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II, § 10. The constitution further provides that "[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures." *Id*. at § 11. Read together, Sections 10 and 11 provide robust protection to people in Montana against government intrusions. *See Goetz*, ¶ 14 (noting that together these provisions provide greater protection against government searches than the federal Fourth Amendment).

23

When a state action implicates these rights, we undertake a three-part analysis to determine whether the action is constitutional. *Goetz*, ¶ 27. First, we determine "whether the person challenging the state's action has an actual subjective expectation of privacy." *Id.* Second, we determine "whether society is willing to recognize that subjective expectation as objectively reasonable." *Id.* If, after the first two steps, we conclude that the defendant did not have a subjective expectation of privacy or that society is unwilling to accept the expectation as reasonable, then no search (as contemplated by the Montana Constitution) has occurred: the police activity in question is not limited by the Montana Constitution, and (absent controlling statute) police may conduct the activity at their discretion, checked only by their own self-restraint. *See State v. Siegal*, 281 Mont. 250, 274, 934 P.2d 176, 190 (1997), *overruled in part on other grounds*, *State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, 970 P.2d 556. However, if there is a subjective expectation of privacy that society is willing to accept as reasonable, then the police conduct constitutes a search, subject to constitutional safeguards. *Goetz*, ¶ 27. We then consider the third step: whether the state action was justified by a compelling state interest or was undertaken with "procedural safeguards such as a properly issued search warrant or other special circumstances." *Id.*

        C.     *Subjective Expectation of Privacy*

¶48    The touchstone of subjective expectations of privacy is not some physical location, but rather an individual's desire to keep some aspect of his or her life secure from the perception of the general public. *Goetz,* ¶ 28; *see also Katz v. United States*, 389 U.S.

347, 351, 88 S. Ct. 507, 511 (1967) ("[T]he Fourth Amendment protects people, not places."). "Where a person has gone to considerable trouble to keep activities and property away from prying eyes, the person evinces a subjective expectation of privacy in those activities and that property." *Goetz*, ¶ 29. Furthermore, to maintain a subjective expectation of privacy in an activity or property, a person need not take extraordinary precautions to shield that activity or property from the public. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, vol. 1, § 2.1(c), 438-39 (4th ed., Thompson West 2004). Rather the focus of the inquiry should be on the "degree of public exposure" that occurs. *Id.* at 439 n. 95.

¶49 Here, we agree with the District Court that Allen expressed a subjective expectation of privacy in his telephone conversation with Golie. Allen testified at the suppression hearing that he did not know that his conversation with Golie was being recorded and that he believed the conversation was private. Allen also testified that he believed that Golie was not using the speaker phone function on her phone and that no third party was using an extension line to overhear the conversation. The recording of the telephone conversation itself further evidences Allen's desire to keep the *substance* of his conversation away from any spying ears of the general public. First, because the conversation was telephonic, half of the conversation was entirely inaudible, making the substance of the conversation poorly intelligible, at best, to any outside listener. Second, it is apparent from the recording that Allen was moving while conversing with Golie: it is highly unlikely that any listener would glean any intelligible information from

25

overhearing a passing snippet spoken by one party to a conversation. Third, during the brief intervals in the conversation when background voices are audible, Allen limited his speech to innocuous platitudes, conveying no information about the topics that he and Golie were discussing (their relationship following the assault on Escobedo). The degree of police intrusion into Allen's privacy by electronically recording the conversation far exceeded the degree to which Allen knowingly exposed this conversation to the public (passing snippets). We conclude that Allen had a subjective expectation of privacy that the conversation was not being surreptitiously recorded by a police informant.

¶50    The State argues that Allen had no subjective expectation of privacy because at one juncture in the recorded conversation he expressed an unwillingness to discuss certain information over the phone. The State cites the portion of the conversation when Golie asked Allen how he would be able to finish a tattoo that he started for her if he were to leave Havre. Allen indicated that she could meet him, and the following exchange occurred:

GOLIE: How am I supposed to do that when you won't even tell me where you're at?
ALLEN: I'll tell you right where I'm at, where I'm going and everything, but I'm not going to do it over the phone, and certainly with no one else around.
GOLIE: That's fine.
. . . .
ALLEN: But no, in that situation I would bring you to the town where I am, but I would damn [sure] blindfold you before I took you to my house. I'll blindfold anybody going to my house. No one's going to know exactly where I live. Nobody. Because of what I'll be doing. There's no way. I don't want anyone to know where it is 'cause I don't want to have to go through the whole situation I just went through to find out who spoke

26

or who talked or whatever, you know. I'm not going to do that. If anything like that happens, I'll know exactly who did it.

¶51 Contrary to the State's argument, this exchange does not indicate that Allen had no subjective expectation of privacy in his phone conversation with Golie. The fact that Allen was especially paranoid about divulging where he lived does not prove that he subjectively expected his conversation to be open to the public. The above-quoted exchange indicates that Allen was unwilling to communicate his whereabouts to anyone by any means. It also indicates that Allen had some (evidently justified) misgivings about the security of telephone conversations. However, if Allen did not expect his conversation to be private, he would not have limited the conversation as he did when he approached other people. The record indicates that Allen strove to shield his conversation from the public. His unwillingness to divulge his whereabouts does not negate this conclusion.

D.  *Whether Society Is Willing to Accept Allen's Expectation as Reasonable*

¶52 We next determine whether society (i.e., the citizens of Montana) is willing to recognize as reasonable the expectation that private cell phone conversations are not being surreptitiously monitored and recorded by agents working for the State. This requires us to evaluate the constitutional values and goals of our state's political system. *Goetz*, ¶ 31. We must remember in making this determination that the privacy of all people in Montana is at stake, not merely the privacy of those people known or suspected of breaking the law. *Id.* at ¶ 32.

¶53    In *Goetz* we concluded—based on language of the Montana Constitution and the convictions expressed by delegates to the 1972 Constitutional Convention—that society is willing to recognize as reasonable "the expectation that conversations held in a private setting are not surreptitiously being electronically monitored and recorded by government agents." *Id.* at ¶¶ 35-37.  While this holding was limited to the facts of that particular case (warrantless recording of face-to-face conversations), the stated rationale was in no way limited to face-to-face conversations and logically extends to telephone conversations, as here, where one party maintains a subjective expectation of privacy.

¶54    To resolve the issue in *Goetz*, we turned to the debates of the state Constitutional Convention.  *Id.* at ¶¶ 33-35.  We cited statements by Delegates Campbell and Dahood on the right to privacy and the right to be free from unreasonable searches and seizures.  *Id.* at ¶ 33.  Both delegates decried electronic monitoring and eavesdropping in general, indicating that the protections of these rights were not limited to traditional physical locations:

> [T]he [Bill of Rights] committee felt very strongly that the people of Montana should be protected as much as possible against eavesdropping, electronic surveillance, and such type of activities . . . .  [I]t is inconceivable to any of us that there would ever exist a situation in the State of Montana where electronic surveillance could be justified.

*Id.* (quoting Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1682, 1687); *see also Siegal*, 281 Mont. at 276, 934 P.2d at 191 (noting that "the delegates . . . voiced clear opposition to *any* form of electronic surveillance of Montana citizens" (emphasis added)).  This generalized distrust of electronic monitoring also

28

appears in the comment of the Bill of Rights Committee that "the privacy of communications should remain inviolate 'from state-level interceptions.'" Montana Constitutional Convention, Committee Proposals, Feb. 22, 1972, p. 633. Further indicating that all communications should enjoy protections from government intrusion, the committee commented that "any . . . legislative enactment [allowing wiretapping] would require, [under Section 10 and Section 11], the showing of a compelling state interest." *Id.*

¶55 It also emerges from the transcript of the convention that the protections of the right to privacy were intended to be dynamic. Delegate Campbell introduced the right to privacy as a means of bolstering the protections against unreasonable searches and seizures by ensuring that those protections would be able to keep pace with and not be outstripped by technological developments:

> Certainly, back in 1776, 1789, when they developed our Bill of Rights, the search and seizure provisions were enough . . . . However, today we have observed an increasingly complex society and we know that our area of privacy has decreased, decreased, decreased . . . . We feel that this [an express right to privacy], as a mandate to our government, would cause a complete reexamination and guarantee our individual citizens of Montana this very important right—the right to be let alone; and this has been called the most important right of them all . . . . "As government functions and controls expand, it is necessary to expand the rights of the individual."

Montana Constitutional Convention, Verbatim Transcript, at 1681 (quoting Editorial, *The Right of Privacy*, Mont. Standard (Butte) 4 (Feb. 3, 1972)). Thus, as technological advancements allow personal communications to occur beyond a single physical setting,

the constitutional protections of the right to privacy keep pace and are not left behind with each passing epoch.

¶56    As United States Supreme Court noted over forty years ago, the telephone has come to play a vital role in private communications. *Katz*, 389 U.S. at 352, 88 S. Ct. at 512. This role is even more pronounced today, and cell phones are ubiquitous in Montana, as elsewhere. *See City of Ontario v. Quon*, ___ U.S. ___, ___ S. Ct. ___, 177 L. Ed. 216, 227 (2010) ("Cell phone . . . communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification."). To allow participant monitoring and recording of telephone conversations without a warrant and, thus, subject only to the self-restraint of law enforcement would "undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in free society." *White*, 401 U.S. at 787, 91 S. Ct. at 1143 (Harlan, J., dissenting); *see also id.* (Douglas, J., dissenting) ("Monitoring, if prevalent, certainly kills free discourse and spontaneous utterances. Free discourse—a First Amendment value—may be frivolous or serious, humble or defiant, reactionary or revolutionary, profane or in good taste; but it is not free if there is surveillance."). This respect for free and spontaneous discourse is reflected not only in our constitutional guarantee of privacy but also in § 45-8-213(1)(c), MCA, which *criminalizes* (with four exceptions) the surreptitious recording of a telephone conversation.

¶57 The history of Montana's constitutional convention indicates that the delegates would not have countenanced warrantless monitoring of private telephone conversations at the time they drafted Montana's constitution. We are convinced the citizenry of this state would not tolerate such unrestrained government conduct today. We therefore conclude that society is willing to recognize as reasonable the expectation that private cell-phone conversations are not being surreptitiously monitored and recorded by government agents. To the degree that *Coleman* and its progeny are inconsistent with this conclusion, they are expressly overruled.

¶58 The Dissent challenges this conclusion, advancing that the Montana Constitution does not protect telephone conversations from state electronic surveillance when, as here, one party consents. At bottom this argument rests on the reasoning drawn from the "obscene phone call hypothetical" in which party A receives an obscene phone call from party B. The Dissent contends that in this situation constitutional protections do not come into play and no warrant is required for police to monitor the call because (1) party A can consent to the recording and (2) party B has no expectation of privacy since he is violating the law. But this logic is flawed. It assumes that party B is violating the law before the conversation has been monitored. This turns the presumption of innocence on its head. Nothing in the transcripts of the Constitutional Convention suggests that the delegates wished to jettison the presumption of innocence and presume that all parties to a conversation who do not consent to its monitoring are engaged in criminal activity. To the contrary, our presumption must be that persons conversing on phones are doing so

legitimately and thus they have a reasonable expectation of privacy. The Dissent also suggests that police will be hindered in their ability to enforce the law unless allowed to monitor phone calls with the consent of only one party. This concern, however, ignores the basic constitutional principle that police must obtain warrants to conduct searches. If, to return to the hypothetical, police have probable cause to believe someone is making obscene phone calls, they can obtain a warrant to record the calls. When we allow the police to bypass the warrant requirement as an undue hindrance to effective law enforcement, we have effectively forfeited our rights to privacy and freedom from unreasonable searches.

¶59    The State argues that cell phones, like that used by Allen, are essentially radios, the transmissions of which may be received by unintended parties. Accordingly, citing *State v. Cotterell*, 2008 MT 409, 347 Mont. 231, 198 P.3d 254, the State argues that users of cell phones have no reasonable expectation of privacy. In *Cotterell* we concluded that the defendant did not have a reasonable expectation of privacy in communications over a hand-held radio. *Id.* at ¶ 52. Unlike *Cotterell*, here, the State cites no evidence from the record (aside from the unsupported assertions of the prosecutor) that Allen communicated over a public channel or that the transmissions could be overheard with equipment that is "easily obtained and readily available." *Id.* at ¶ 53. Accordingly, we reject the State's argument based on the radio analogy.

¶60    The State next suggests that the debates from the Constitutional Convention support its claim that society is unwilling to accept as reasonable expectations of privacy

32

in telephone conversations. Specifically, the State notes Delegate Robinson's withdrawal in response to opposition of a proposed amendment to Article II, Section 11, adding that "privacy of communications shall be inviolate." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1683-87. Contrary to the State's argument, we cannot conclude that the withdrawal of a blanket prohibition on state intrusion upon private communications was an endorsement of unchecked, warrantless police monitoring of private telephone conversations.

¶61 In sum, we conclude that Allen had a subjective expectation of privacy in his cell-phone conversation with Golie and that our society is willing to recognize that expectation as reasonable. Accordingly, Golie's recording of the conversation at the behest of law enforcement constituted a search under Article II, Sections 10 and 11 of the Montana Constitution.

### E. Nature of Government Intrusion

¶62 Having determined that a search occurred, we must next consider whether the search was reasonable; that is, whether it was justified by a narrowly tailored, compelling state interest or subject to adequate procedural safeguards. *Goetz*, ¶ 27. If not, then the search was unconstitutional. *Id.* Where, as here, police conduct a search without a warrant, then we consider it "*per se* unreasonable, absent a recognized exception." *Id.* at ¶ 40. The State carries the burden of proving that an exception to the warrant requirement applies. *Id.*

¶63     The State argues that the consent exception applies by virtue of Golie's agreement to record the conversation. We disagree. In *Goetz*, we considered application of the consent exception to police monitoring of face-to-face conversations where only one party to the conversation consents to the recording. *Id.* at ¶¶ 41-46. We concluded that the consent exception did not excuse the absence of a warrant. *Id.* at ¶ 46. To reach this conclusion, we adopted the complimentary rules regarding consent of a co-tenant announced in *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515 (2006): (1) the consent of a co-tenant to a search of shared premises is valid if the other co-tenant is absent, but (2) such consent is not valid if the other co-tenant is physically present and objects to the search. *Goetz*, ¶¶ 44-45. Applying this rule, the *Goetz* Court reasoned that since both parties were present, each must have the opportunity to object before police could conduct the search. *Id.* at ¶ 45.

¶64     Contrary to the State's argument, this reasoning applies, without distortion, to the present situation involving a telephone conversation. While the parties to the conversation here, Allen and Golie, were not in the same physical location, they were both "present" during the conversation in that law enforcement could have obtained the consent of each to record the conversation. However, even though Allen was available to consent (or object) to the recording of the conversation, police did not give him the opportunity to do so. Accordingly, as in *Goetz*, the consent exception does not apply. The State does not argue that any other exception excuses its failure to obtain a warrant and cites no narrowly-tailored, compelling interest. Consequently, we conclude that the

search (i.e., the recording of Allen and Golie's conversation) was unreasonable and, thus, violative of Sections 10 and 11 of the Montana Constitution.

¶65 In the event of a new trial, the recording of Golie and Allen's conversation may not be admitted into evidence.[2]

¶66 ***3. Whether the District Court abused its discretion when it denied Allen's request for a jury instruction on accomplice testimony.***

¶67 The final issue regards the District Court's refusal of Allen's proposed jury instruction regarding the "accomplice" testimony of Golie. Allen contends that this was error. The State disagrees. We conclude that the District Court erred in denying this instruction.

¶68 Section 26-1-303(4), MCA, reads: "The jury is to be instructed by the court on all proper occasions that: . . . the testimony of a person legally accountable for the acts of the accused ought to be viewed with distrust . . . ." We have interpreted this statute to entitle a criminal defendant to such an instruction in "all proper occasions." *State v. Johnson*, 257 Mont 157, 163, 848 P.2d 496, 499 (1993). Our case law indicates that an occasion is

---

[2] Justice Nelson's concurrence suggests that the Court's decision does not go far enough. He argues that failing to suppress Golie's testimony "is akin to suppressing evidence obtained by means of an unlawful entry into the defendant's home, but then allowing the officers to testify about that evidence and the fact that they found it in the defendant's home." First of all, since Allen's motion was to suppress the recording, not Golie's testimony, the issue is not before the Court. Secondly, the analogy fails. In the hypothetical, but for the illegal entry, the officer would not have been in the home to make observations. Accordingly, his observations and testimony along with the physical evidence obtained are fruits of the poisonous tree. Here Golie's engaging in a cell phone conversation with Allen is not poisoned by the fact of the recording. It cannot be said that, but for the illegal recording, Golie would not have been conversing with Allen, particularly given that he invited her to participate in this escapade to begin with.

proper when (1) an accomplice gives direct testimony, (2) the defendant requests such an instruction, and (3) the instruction is not inconsistent with the defendant's claim of innocence. *State v. Hall*, 2003 MT 253, ¶ 30, 317 Mont. 356, 77 P.3d 239; *Johnson*, 257 Mont at 163, 848 P.2d at 499.

¶69  Here, these elements are met. The first inquiry is whether an accomplice gave direct testimony. A person is an accomplice and legally accountable for the acts of another when "either before or during the commission of an offense with the purpose to promote or facilitate the commission, the person solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense." Section 45-2-302(3), MCA. Whether a person is an accomplice is a question for the jury, unless it is undisputed. *Rose v. State*, 1998 MT 342, ¶ 13, 292 Mont. 350, 972 P.2d 321.

¶70  Here the record contains ample evidence from which the jury could conclude that Golie was an accomplice to the attack on Escobedo. Golie aided Allen in his assault on Escobedo by driving him to the residence were Escobedo was babysitting his nieces (which is undisputed). Moreover, the testimony of Pickens, Allen, Escobedo, and Golie, herself, if believed, supports the conclusion that Golie had the intention of promoting or facilitating the assault. Pickens testified that Golie encouraged Allen to go to Escobedo's to "take care of business." Allen's testimony, while somewhat equivocal, seemed to indicate that Golie knew he wanted to assault Escobedo. Defense counsel asked Allen if he told Golie why he wanted to visit Escobedo, to which Allen responded, "Absolutely, yeah. She was all for it. Absolutely. She knew exactly what was going on." Further,

36

both Allen and Escobedo testified (and Golie agreed) that as soon as Escobedo entered the car Golie began to upbraid him for talking to others about her and that she was angry and threatening towards him.

¶71 There is no question that there was sufficient testimony from which a jury could conclude that Golie was an accomplice. Golie was one of the State's principal witnesses and her testimony, which consumes nearly seventy pages of the transcript, was direct evidence against Allen. Allen requested a jury instruction that Golie's testimony "ought to be viewed with distrust." This request was not inconsistent with Allen's claim of innocence: Allen admitted assaulting Escobedo, but denied using a weapon. Thus, Allen was entitled to a jury instruction that Golie's testimony should be viewed with distrust. The District Court erred in denying this instruction. On retrial, Allen is entitled to a jury instruction regarding accomplice testimony under § 26-1-303(4), MCA.

¶72 For the foregoing reasons, Allen's conviction is reversed and remanded for a new trial consistent with this opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Justice James C. Nelson, specially concurring.

¶73    It's time that we jettison the *Katz* test. Here's why.

## I. Introduction

¶74    I concur in the Court's Opinion as to Issues 1 and 3. As to Issue 2, I agree with the Court that the warrantless recording of Allen and Golie's telephone conversation violated Article II, Sections 10 and 11 of the Montana Constitution. However, I suggest that our decisions here and in *State v. Goetz*, 2008 MT 296, 345 Mont. 421, 191 P.3d 489, do not fully rectify the constitutional violation. In fact, our approach creates an anomaly in that the more reliable evidence of what Allen said (the recording) is not admissible but the less reliable evidence (Golie's testimony about what he said, based on her unaided memory) is admissible. Not only that, while we uphold Allen's constitutional rights by suppressing the actual recording, we simultaneously undermine those rights by allowing Golie to testify (albeit, based on her unaided memory) as to the contents of the recording. This is akin to suppressing evidence obtained by means of an unlawful entry into the defendant's home, but then allowing the officers to testify about that evidence and the fact that they found it in the defendant's home. Granted, seeing physical evidence (such as the murder weapon or the baggie of marijuana) is often more compelling to the jurors than hearing a witness simply describe it. And this is even more true about verbal evidence: Hearing a recording played in court carries greater weight than hearing a witness testify about what was said, especially if the defense is able to undercut the witness's credibility. But the point is that we not only suppress the murder weapon or the

38

baggie of marijuana obtained pursuant to an unlawful search or seizure, we also disallow any testimony about it. *See Murray v. United States*, 487 U.S. 533, 536, 108 S. Ct. 2529, 2533 (1988); *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963). Correspondingly, then, not only should the illegal recording of the defendant's conversation be excluded, but so should any testimony about the contents of the recording. "Whether the informant testifies, or the officer testifies with the tape, the evidentiary potential is the same." *Goetz*, ¶ 106 (Rice, J., dissenting). Hence, the constitutional violation is left only half rectified when we suppress only the tape.

¶75    I believe this is totally incongruous and devoid of any persuasive justification. As explained below, one of the rationales proffered in support of these inconsistent results is that surreptitiously recording or eavesdropping on a conversation is a more offensive and invasive evidence-gathering technique than acquiring the same evidence by means of a face-to-face stratagem, such as an agent who masquerades as the person's confidant and then testifies as to what the person unwittingly said. In my view, however, the fact that one technique may seem more offensive or invasive than another is beside the point. Both techniques involve the extraction of evidence from the speaker, and both implicate the speaker's right to be secure from unreasonable searches. Another proffered rationale is premised on supposed "risks" and "expectations"—specifically, that people risk or must expect that they may be deceived as to the identity of one with whom they speak, but do not risk or expect that their statements are being secretly recorded or monitored. Again, however, I believe that theoretical risks or expectations are beside the point. In

this regard, I have reconsidered and now disagree with the notion—which we adopted from Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967)—that a "search" is determined by whether a person's expectation of privacy is one that society is prepared to recognize as "reasonable." *See e.g. State v. Bullock*, 272 Mont. 361, 375, 901 P.2d 61, 70 (1995); *State v. Cotterell*, 2008 MT 409, ¶¶ 26-27, 347 Mont. 231, 198 P.3d 254. For one thing, when this "self-indulgent test"[1] is employed, the privacy expectations that society is prepared to recognize as reasonable ultimately turn out to be the privacy expectations that a majority of the members of this Court decide are reasonable. It is doubtful that we are qualified or equipped to make such proclamations, especially in the absence of a factual record telling us what society's views and expectations are. Moreover, as applied in the present case, the "expectations" test leads to the illogical conclusion that a person's conversation with an informant has been "searched" to the extent that the informant records the conversation but has not been "searched" to the extent that the informant simply commits the conversation to memory. At a more fundamental level, however, the underlying premise that a "search" is defined by "risks" or "expectations" is itself implausible, for reasons I explain below.

¶76 Accordingly, rather than engage in subjective line-drawing about which privacy expectations we think society is prepared to recognize as reasonable and which law enforcement techniques we feel are too repugnant or invasive, we should simply apply

---

[1] *Minnesota v. Carter*, 525 U.S. 83, 97, 119 S. Ct. 469, 477 (1998) (Scalia & Thomas, JJ., concurring).

the constitutional language according to its plain meaning. It states that "[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures." Mont. Const. art. II, § 11. A "search" is "an endeavor to find, ascertain, recover, or the like; . . . hence, pursuit with a view to finding, etc." *Webster's New International Dictionary of the English Language* 2257 (2d ed. 1934). And to "search" means " '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.' " *Kyllo v. United States*, 533 U.S. 27, 32 n. 1, 121 S. Ct. 2038, 2042 n. 1 (2001) (quoting N. Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989)). When the government engages in such activity, it is conducting a "search"; and when that search implicates an individual's person, papers, home, or effects, the government must first procure a warrant (absent an exception to the warrant requirement). If it fails to do so, then the evidence obtained, in whatever form, should be suppressed.

¶77 My analysis below is in two parts. First, I explain that using an agent to acquire a suspect's verbalized thoughts by means of an in-person stratagem is a "search" requiring a warrant. Second, I explain that allowing an agent to provide testimony regarding illegally obtained (and, therefore, suppressed) evidence undermines the right against unreasonable searches and, thus, is contrary to the purposes of the exclusionary rule.

## II. "Search" Analysis

¶78 Article II, Section 11 of the Montana Constitution and the Fourth Amendment to the United States Constitution both protect the right of the people to be secure in their

persons, papers, homes, and effects from unreasonable searches and seizures. No one would dispute that when a police officer enters a person's home and rummages through her belongings, it is a "search." But what about when the police seek a person's knowledge concerning illegal activities? So far, the government is not able to enter and rummage through a person's mind for "guilty knowledge"—although that possibility may be on the horizon.[2] And while direct questioning sometimes yields such evidence, the fact is that it is often necessary to employ stratagem or secret monitoring in order to catch those engaged in criminal enterprises. *See Lewis v. United States*, 385 U.S. 206, 208-09, 87 S. Ct. 424, 426 (1966). The question then arises as to whether the government is conducting a "search" when it acquires verbal evidence through such techniques. Can verbal evidence be the subject of a search? Do people have a privacy interest in their communications? Is there a material distinction, for constitutional purposes, between memorizing what a suspect says and simultaneously recording what the suspect says?

¶79 The Supreme Court considered these issues in a series of cases decided in the 1950s, '60s, and '70s. Although my conclusions herein rest on independent state law grounds under the Montana Constitution, our jurisprudence on the subjects of electronic surveillance, privacy in communications, and what constitutes a "search" has borrowed concepts articulated by the Supreme Court in those cases. *See e.g.* Opinion, ¶¶ 37, 40; *Goetz*, ¶ 22; *Cotterell*, ¶¶ 26-27. Notably, that Court's decisions in this area proceed on a

_____

[2] *See* ScienceDaily, *Mind Reading, Brain Fingerprinting and the Law*, http://www.sciencedaily.com/releases/2010/01/100120085459.htm (Jan. 24, 2010).

tortuous path and are difficult to reconcile.  Nevertheless, they provide important context for my analysis.  Thus, I begin with a discussion of six of the cases.

### *On Lee*

¶80    First, in *On Lee v. United States*, 343 U.S. 747, 72 S. Ct. 967 (1952), the defendant (On Lee), who owned a laundry, was suspected of engaging in illegal narcotics traffic. Government agents enlisted the services of one Chin Poy, an old acquaintance and former employee of On Lee.  Chin Poy was equipped with a small microphone and transmitting device which enabled one of the agents (Agent Lee), stationed outside, to monitor Chin Poy's conversations with On Lee.  Chin Poy, acting without a warrant, then engaged On Lee in a conversation at the laundry during which On Lee made incriminating statements which were overheard by Agent Lee.  At trial, Chin Poy was not called to testify about On Lee's admissions; rather, Agent Lee related the conversations as heard through his receiving set.

¶81    On appeal, the Supreme Court, by a five-justice majority, affirmed the admission of this evidence.  The Court relied on the rule, articulated in *Olmstead v. United States*, 277 U.S. 438, 48 S. Ct. 564 (1928), that the Fourth Amendment is violated only where there has been (1) a search and seizure of the defendant's person, (2) a seizure of his papers or his tangible material effects, or (3) an actual physical invasion of his house or curtilage for the purpose of making a seizure.  *Id*. at 466, 48 S. Ct. at 568; *see also Goldman v. United States*, 316 U.S. 129, 134-35, 62 S. Ct. 993, 996 (1942).  In other words, as applicable here, the Amendment is limited to the tangible fruits of actual

43

trespasses. Based on this restrictive view of the constitutional language, the Court held that the conduct of Chin Poy and Agent Lee did not amount to an unlawful search and seizure because "no trespass was committed. Chin Poy entered a place of business with the consent, if not by the implied invitation, of [On Lee]." *On Lee*, 343 U.S. at 751-52, 72 S. Ct. at 971.

¶82 On Lee urged the Court to reconsider the question of Fourth Amendment rights in the field of overheard or intercepted conversations. But the Court responded that even if it overruled *Olmstead* and its progeny, On Lee's challenge would still fail because he

> was talking confidentially and indiscreetly with one he trusted, and he was overheard. This was due to aid from a transmitter and receiver, to be sure, *but with the same effect on his privacy* as if agent Lee had been eavesdropping outside an open window. The use of bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon what one supposes to be private indiscretions. It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure.

*On Lee*, 343 U.S. at 753-54, 72 S. Ct. at 972 (emphasis added). Implicit in this reasoning is the principle, reflected in subsequent cases discussed below, that a person's privacy interest is the same whether (a) the auditor (i.e., the person being spoken to) is wearing a transmitting device, (b) the auditor is secretly recording the conversation at the behest of the government, or (c) the auditor is committing the conversation to memory.

***Silverman***

¶83    Next, in *Silverman v. United States*, 365 U.S. 505, 81 S. Ct. 679 (1961), the police suspected that certain premises were being used for a gambling operation. They obtained permission to enter a vacant adjoining row house, and from there inserted a "spike mike" through the party wall until it made contact with a heating duct serving the defendants' house, "thus converting their entire heating system into a conductor of sound." *Id.* at 507, 81 S. Ct. at 680. The officers then listened to conversations taking place in the defendants' house, about which the officers testified at trial.

¶84    The Supreme Court held that this violated the Fourth Amendment. Writing for the Court, Justice Stewart distinguished *Olmstead*, *Goldman*, and *On Lee* on the ground that those cases did not involve an "unauthorized physical penetration" into the defendants' premises, whereas here the officers overheard the defendants' conversations "only by usurping part of the [defendants'] house or office—a heating system which was an integral part of the premises occupied by the [defendants], a usurpation that was effected without their knowledge and without their consent." *Id.* at 509, 511, 81 S. Ct. at 681, 682. Justice Stewart stated that "an actual intrusion into a constitutionally protected area" violates the Fourth Amendment "whether or not there was a technical trespass under the local property law relating to party walls." *Id.* at 511, 512, 81 S. Ct. at 682, 683. He thus implicitly rejected the trespass rationale underlying *Olmstead*, *Goldman*, and *On Lee*. Likewise, in finding a constitutional violation here, he implicitly held that the fruits of electronic surveillance, though *intangible*, are within the reach of the Fourth Amendment.

45

This holding was reaffirmed two years later in *Wong Sun v. United States*, 371 U.S. 471, 485-86, 83 S. Ct. 407, 416 (1963).

¶85    Notably, Justice Stewart further observed that "[t]his Court has never held that a federal officer may without warrant and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard." *Silverman*, 365 U.S. at 511-12, 81 S. Ct. at 683. One would think that this rule should apply to all secret encroachments upon a person's privacy for purposes of evidence gathering. In this regard, Justice Douglas concurred in the Court's decision but found it incongruous that a listening device placed on the outside wall of a house or office is a permissible invasion of privacy (*Goldman*) while a listening device that penetrates the wall is not (*Silverman*). He argued—correctly, in my view— that the invasion of privacy occurs not because there is "an unauthorized physical penetration into the premises," but because "the intimacies of the home [are] tapped, recorded, or revealed." *Id.* at 512-13, 81 S. Ct. at 683 (Douglas, J., concurring).

### *Lopez*

¶86    The next important decision is *Lopez v. United States*, 373 U.S. 427, 83 S. Ct. 1381 (1963). In that case, the defendant (Lopez) was charged with attempting to bribe an agent of the Internal Revenue Service (Agent Davis). The charges arose out of several conversations between Lopez and Agent Davis at Lopez's business office. During a meeting on October 21, 1961, Lopez offered Agent Davis money to drop his investigation into possible evasion of excise taxes. Agent Davis reported this to his

superior and thereafter met with four Internal Revenue Inspectors, who instructed him to keep his appointment with Lopez on October 24, to pretend to play along with the scheme, and to draw the conversation back to the October 21 meeting. Agent Davis was equipped with a pocket wire recorder, which recorded his October 24 conversation with Lopez during which Lopez made incriminating statements. Agent Davis later testified about this conversation at trial, and the recording was also admitted into evidence.

¶87　On the question of whether Lopez's Fourth Amendment rights were violated, Justice Harlan, writing for the majority, noted that the Supreme Court had sustained against constitutional challenge the government's use of electronic devices to eavesdrop on conversations, *id.* at 438, 83 S. Ct. at 1387-88 (citing *Olmstead* and *Goldman*), so long as the device was not "planted by an unlawful physical invasion of a constitutionally protected area," *id.* at 438-39, 83 S. Ct. at 1388 (citing *Silverman*). Yet here, there had not even been any "eavesdropping," since the government did not use an electronic device to listen in on conversations it could not otherwise have heard, but rather used the device "to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose." *Id.* at 439, 83 S. Ct. at 1388. Moreover, the device was not planted by means of an unlawful physical invasion of Lopez's premises, but rather was carried in and out by an agent who was there with Lopez's assent, and it neither saw nor heard more than the agent himself. *Id.* Thus, Justice Harlan wrote, Lopez's claim was, in essence, that he had "a constitutional right to rely on possible flaws in the agent's memory, or to

challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment," since "no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory." *Id.* Justice Harlan rejected this claim, stating: "We think the risk that [Lopez] took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." *Id.*

¶88 Justice Brennan wrote a vigorous dissent, in which Justices Douglas and Goldberg joined. First, regarding the government's argument that Lopez surrendered his right of privacy when he communicated his "secret thoughts" to Davis, Justice Brennan observed:

> The assumption, manifestly untenable, is that the Fourth Amendment is only designed to protect secrecy. If a person commits his secret thoughts to paper, that is no license for the police to seize the paper; if a person communicates his secret thoughts verbally to another, that is no license for the police to record the words. *Silverman v. United States*, 365 U.S. 505. *On Lee* certainly rested on no such theory of waiver. The right of privacy would mean little if it were limited to a person's solitary thoughts, and so fostered secretiveness. It must embrace a concept of the liberty of one's communications, and historically it has. "The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others . . . and even if he has chosen to give them expression, he generally retains the power *to fix the limits of the publicity which shall be given them*." Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 198 (1890). (Emphasis supplied.)

*Lopez*, 373 U.S. at 449-50, 83 S. Ct. at 1393 (ellipsis in original).

¶89 Justice Brennan went on to discuss the distinct functions served by the two clauses of the Fourth Amendment, which state:

[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [2] no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The second clause, he explained, was aimed specifically at the evil of the general warrant, often regarded as the single immediate cause of the American Revolution. *Id.* at 454, 83 S. Ct. at 1396. But of greater significance here, the first clause

embodies a more encompassing principle. It is . . . that government ought not to have the untrammeled right to extract evidence from people. Thus viewed, the Fourth Amendment is complementary to the Fifth. *Feldman v. United States*, 322 U.S. 487, 489-490. The informing principle of both Amendments is nothing less than a comprehensive right of personal liberty in the face of governmental intrusion.

*Id.* at 454-55, 83 S. Ct. at 1396. Justice Brennan noted that "a comprehensive right of privacy" under the Fourth and Fifth Amendments had been recognized and repeatedly approved in the Court's decisions. *See id.* at 456-57, 83 S. Ct. at 1397.

¶90 Yet, despite these broad views regarding personal liberty, Justice Brennan did not dispute the majority's conclusion that Agent Davis could testify about his conversations with Lopez. Thus, it seems that Justice Brennan's objection had less to do with the fact that the government had extracted evidence from Lopez without a warrant and more to do with the nature of the evidence itself. Indeed, his position was that a secretly made recording of a person's verbalized thoughts violates the Fourth Amendment, but the agent's testimony from memory as to what the person said does not.

¶91 In support of this distinction, Justice Brennan asserted that there is "a qualitative difference between electronic surveillance, whether the agents conceal the devices on their persons or in walls or under beds, and conventional police stratagems such as eavesdropping and disguise." *Id.* at 465, 83 S. Ct. at 1402. He argued that "[t]he latter do not so seriously intrude upon the right of privacy" because "[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.* He suggested that this risk "is not an undue risk to ask persons to assume, for it does no more than compel them to use discretion in choosing their auditors, to make damaging disclosures only to persons whose character and motives may be trusted." *Id.* at 450, 83 S. Ct. at 1393. However, electronic surveillance, he posited, imposes a risk of "a different order." *Id.* Specifically, it is

> the risk that third parties, whether mechanical auditors like the Minifon [as in *Lopez*] or human transcribers of mechanical transmissions as in *On Lee*—third parties who cannot be shut out of a conversation as conventional eavesdroppers can be, merely by a lowering of voices, or withdrawing to a private place—may give independent evidence[3] of any conversation.

*Id.* at 450, 83 S. Ct. at 1394. Justice Brennan argued that "[t]here is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true

---

[3] Earlier in his dissent, Justice Brennan explained that a mechanical recording is "independent evidence" of the person's statements, as opposed to evidence that merely repeats or corroborates the agent's testimony. *Lopez*, 373 U.S. at 448, 83 S. Ct. at 1392-93.

privacy." *Id.* at 466, 83 S. Ct. at 1402. He concluded that "[t]here is only one way to guard against such a risk, and that is to keep one's mouth shut on all occasions." *Id.* at 450, 83 S. Ct. at 1394.

¶92 I question Justice Brennan's assumption that there is no way of mitigating the risk that third parties may give independent evidence of a conversation. The speaker could mitigate this risk by, for example, sweeping the immediate area for bugs and by checking his auditor for hidden microphones and recorders. In fact, taking such precautionary measures may be highly effective in mitigating the risk of mechanical eavesdropping and recording. In contrast, even when the speaker uses "discretion" in choosing an auditor whose character and motives seem trustworthy, such trust may turn out to be misplaced or later circumstances may compel the auditor to divulge the conversation. Bottom line: Steps may be taken to mitigate both risks identified by Justice Brennan—i.e., the risk that one's statements will be divulged by one's auditor and the risk that one's statements will be monitored, recorded, and divulged through electronic means. But regardless of how many steps are taken to ensure confidentiality, the fact remains that whenever we speak, there is a risk that our statements may be repeated. And the only way to guard against such risk, whether it is created by the possibility of an unreliable auditor or the possibility of a hidden electronic device, is simply not to speak—i.e., "to keep one's mouth shut on all occasions." Of course, as Justice Brennan points out earlier in his dissent, "[t]he right of privacy would mean little if it were limited to a person's solitary thoughts, and so fostered secretiveness." *Lopez*, 373 U.S. at 449-50, 83 S. Ct. at 1393. Indeed, what,

then, will be the protection of Article II, Sections 10 and 11, when the government has the technology to surreptitiously read another's thoughts? *See* ¶ 78 n. 2, *supra*.

¶93 Also problematic with this "risk" approach is the fact that what a person risks is ultimately determined by what the law allows. Thus, when the law allows warrantless participant monitoring or recording (as was the case until our decision in *Goetz*), the risk of such monitoring or recording becomes as "inherent in the conditions of human society" as the risk of being overheard by an eavesdropper, betrayed by an informer, or deceived as to the identity of one with whom one deals. Indeed, because Allen's conversation with Golie occurred prior to our decision in *Goetz*, it could be said that he took the "risk" that this conversation would be recorded without a search warrant, given that our pre-*Goetz* caselaw allowed for that.

¶94 But regardless of these questionable facets of the "risk" approach, I do not find the question of risk to be pertinent, in any event, to the question posed by the constitutional language: Did the governmental action at issue constitute a "search" which intruded upon the defendant's person, home, papers, or effects? Justice Brennan's "risk" approach is premised on the notion that "the Fourth and Fifth Amendments interact to create a comprehensive right of privacy, of individual freedom, [which] has been repeatedly approved in the decisions of this Court." *Lopez*, 373 U.S. at 456-57, 83 S. Ct. at 1397-98 (citing *Boyd v. United States*, 116 U.S. 616, 6 S. Ct. 524 (1886), and other cases). He thus frames the issue as one of "privacy," rather than one of "search" and "security" in one's person, home, papers, and effects. I do not believe the two are the same, however.

52

For example, a person might create a site on the Internet advertising the sale of illicit drugs out of his home, and thus forfeit any claim of privacy in such activity; but this does not give the police carte blanche to barge into his house without a warrant and conduct a search. More to the point, though, I do not believe that "privacy" and "search" should be treated the same under the Montana Constitution. While it might be argued that there is an implicit right of privacy under the Fourth and Fifth Amendments together, as well as a separate right against unreasonable searches under the Fourth Amendment alone, the reality is that *both* of these rights are set out *separately* in the Montana Constitution under Article II, Section 10 (privacy) and Section 11 (searches). Thus, it is error to treat them as creating just one single right of privacy. Section 10 ensures the right of individual privacy, but Section 11 ensures a substantively different right: the right to be secure in one's person, papers, home, and effects from unreasonable searches.

¶95　While a "risk" approach (or, as discussed below, an "expectations" approach) may be useful for resolving questions of "privacy," it is not, in my view, proper for resolving questions of "search." As noted, a "search" is "an endeavor to find, ascertain, recover, or the like; . . . hence, pursuit with a view to finding, etc." *Webster's New International Dictionary of the English Language* 2257 (2d ed. 1934); *see also e.g. State v. Arthun*, 274 Mont. 82, 88, 906 P.2d 216, 220 (1995) (" 'A "search" is a prying into hidden places for that which is concealed.' " (quoting *State v. Carlson*, 198 Mont. 113, 118, 644 P.2d 498, 501 (1982))). And to "search" means " '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.' " *Kyllo v. United States*, 533

53

U.S. 27, 32 n. 1, 121 S. Ct. 2038, 2042 n. 1 (2001) (quoting N. Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989)). The "risk" test tells us nothing about whether the government is engaged in such activity. It shifts the focus from what the government is doing—looking for evidence—to what risks we think are okay to impose on society and what evidence-gathering techniques we think intrude "seriously" on the right of privacy. The constitutional language mandates, however, that whenever the government is "searching," the individual in question has the right to be secure in her person, home, papers, and effects that the search will be reasonable—regardless of the risks she supposedly assumed and regardless of how seriously the particular evidence-gathering technique may intrude on her privacy.

¶96   For these reasons, I believe the proper focus is not on theoretical risks but, rather, is on whether the government is engaged in acquiring or extracting evidence and whether the defendant has knowingly chosen to expose his thoughts to the public or to someone he knows to be a law enforcement agent. In *Lopez*, there is no question that Agent Davis was engaged in extracting evidence from Lopez. But Lopez knew full well that he was speaking with a government agent, and he knowingly chose to expose his thoughts (the attempted bribes) to that agent. A person who does so cannot be heard to complain that the evidence of those verbalized thoughts—whether in the form of the agent's testimony or an electronic recording—was the product of an illegal search. On the other hand, an entirely different situation is presented where the auditor's status as an agent of the government is kept hidden. There, the speaker does not make a knowing choice to waive

54

his right against a warrantless search of his thoughts and communications. And I suggest that his security in his person is violated no less when the agent, masquerading as a confidant, commits the person's verbalized thoughts to memory versus when the agent simultaneously records those thoughts.

### *Hoffa*

¶97 Nonetheless, the Supreme Court again used the "risk" approach in *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408 (1966). That case involved an individual named Partin, who was an associate of James Hoffa. At the time (autumn 1962), Hoffa was on trial for violating the Taft-Hartley Act, and federal agents suspected that he might attempt to tamper with the jury in his trial. They accordingly enlisted Partin as a government informer, asking him to be on the lookout for such attempts and to report any wrongdoing he discovered. Ultimately, Hoffa made incriminating statements in Partin's presence, and Partin's reports and his subsequent testimony at Hoffa's trial contributed to Hoffa's conviction for endeavoring to bribe members of the jury in his 1962 trial.

¶98 On appeal, the Supreme Court rejected the contention that the government, through Partin, had conducted an illegal "search" for verbal evidence. Writing for the majority, Justice Stewart found it significant that Partin had not been a "surreptitious eavesdropper" but, rather, had been in Hoffa's presence by invitation, and that every conversation Partin had heard was either directed to him or knowingly carried on in his presence. *Hoffa*, 385 U.S. at 302, 87 S. Ct. at 413. Hoffa, evidently, had simply relied on a "misplaced confidence" that Partin would not reveal his wrongdoing. Quoting Justice

Brennan's *Lopez* dissent, Justice Stewart observed that " '[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.' " *Id.* at 302-03, 87 S. Ct. at 413-14.

### *Katz*

¶99 In contrast, the Court held that the governmental eavesdropping at issue in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967), did violate the defendant's privacy in his conversations. In that case, FBI agents attached an electronic listening and recording device to the outside of the public telephone booth from which the defendant placed his calls. Evidence of the defendant's end of his conversations was then used at trial to convict him of transmitting wagering information by telephone in violation of federal law. At the outset of his opinion for the Court, Justice Stewart addressed the parties' focus on whether the telephone booth was a "constitutionally protected area"—a term the Court had used in *Silverman*. He rejected the premise that Fourth Amendment questions depend on whether a given "area," viewed in the abstract, is "constitutionally protected." He explained that "the Fourth Amendment protects people, not places." *Id.* at 351, 88 S. Ct. at 511; *see also Warden v. Hayden*, 387 U.S. 294, 304, 87 S. Ct. 1642, 1648 (1967) ("[T]he principal object of the Fourth Amendment is the protection of privacy rather than property . . . ."). Thus, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally

protected." *Katz*, 389 U.S. at 351, 88 S. Ct. at 511 (citations omitted). Here, for instance, while a telephone booth is generally accessible to the public, "[o]ne who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." *Id.* at 352, 88 S. Ct. at 511-12. Thus, when the defendant entered the booth and sought to exclude "the uninvited ear" by shutting the door, he could expect that his words were private, particularly given "the vital role that the public telephone has come to play in private communication." *Id.* at 352, 88 S. Ct. at 511, 512.

¶100 The government argued that no Fourth Amendment violation had occurred because the surveillance technique involved "no physical penetration" of the telephone booth. But Justice Stewart rejected this argument, explaining that because the Fourth Amendment extends to the recording of oral statements overheard without any technical trespass under local property law (citing *Silverman*), and because it protects "people," and not simply "areas" against unreasonable searches and seizures, "it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Id.* at 353, 88 S. Ct. at 512. He thus concluded that "[t]he Government's activities in electronically listening to and recording the [defendant's] words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.*

¶101 This analysis is consistent with the "risk" approach employed in *Lopez* and *Hoffa*, although the *Katz* Court framed the inquiry as what one is justifiably entitled to "assume" under the circumstances. In fact, Justice Stewart's analysis prompted Justice Harlan, concurring in the decision, to opine that a "search" occurs in the following situations:

> My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.

*Id.* at 361, 88 S. Ct. at 516 (Harlan, J., concurring). Here, he reasoned, a telephone booth is "a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable." *Id.* at 361, 88 S. Ct. at 516-17.

¶102 The Court's holding in *Katz*—that one who uses a closed telephone booth has a justifiable right of privacy and may assume that the words he utters into the mouthpiece "will not be broadcast to the world"—seems in tension with the holding of *Hoffa*, which stands for the contrary rule that the speaker must assume the risk that the words he utters into the mouthpiece *will* (or at least *could*) be broadcast to the world by the person at the other end of the line, who might be a government informer. Indeed, the FBI agents in *Katz* might have gathered the very same evidence by enlisting the recipient of the defendant's calls to record them, which evidently (according to *Hoffa* and *Lopez*) would

not have infringed the Fourth Amendment. Thus, if *Hoffa* is still good law after *Katz*, there must be a critical distinction between the cases which allows the sort of warrantless evidence gathering conducted in *Hoffa* but disallows the sort of warrantless evidence gathering conducted in *Katz*.

¶103 The first apparent distinction is the particular means employed by the FBI agents in *Katz*: attaching a listening and recording device to the outside of the booth, rather than using a face-to-face ruse to obtain the defendant's words. Yet, if a person in a closed telephone booth truly has a constitutionally protected right of privacy and is entitled to assume that the words she utters into the mouthpiece are private, then gathering those words invades her privacy regardless of how they are obtained.

¶104 A second distinction involves "risks" and "expectations." According to the Court majorities in the above cases, a person risks that the person to whom she is speaking is a government agent who is recording (*Lopez*) or committing to memory (*Hoffa*) her statements. But a person does not expect that the government is secretly listening in on her conversations with someone who is *not* a government agent (*Katz*). This distinction is untenable because it rests on the absurd premise that a person's expectation of privacy turns on a fact of which she is unaware—namely, whether the person to whom she is speaking is *in fact* a government agent. Moreover, as noted before, what a person risks or expects is ultimately determined by what the law allows. As Justice Harlan later acknowledged, "[o]ur expectations, and the risks we assume, are in large part reflections of laws that translate into rules the customs and values of the past and present." *United*

59

*States v. White*, 401 U.S. 745, 786, 91 S. Ct. 1122, 1143 (1971) (Harlan, J., dissenting).

Justice Marshall made a similar point in *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577 (1979):

> More fundamentally, to make risk analysis dispositive in assessing the reasonableness of privacy expectations would allow the government to define the scope of Fourth Amendment protections. For example, law enforcement officials, simply by announcing their intent to monitor the content of random samples of first-class mail or private phone conversations, could put the public on notice of the risks they would thereafter assume in such communications.

*Id.* at 750, 99 S. Ct. at 2585 (Marshall & Brennan, JJ., dissenting). Likewise, if a court decides that the law allows warrantless participant recording of telephone calls, then the risk/expectation of being recorded becomes a risk/expectation that we assume whenever we speak. I disagree with the premise that the constitutional protections were intended to be left to the whims of judges who may think that one privacy expectation is objectively reasonable and another is not. *Cf. Minnesota v. Carter*, 525 U.S. 83, 97, 119 S. Ct. 469, 477 (1998) (Scalia & Thomas, JJ., concurring) ("In my view, the only thing the past three decades have established about the *Katz* test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in *Katz*) is that, unsurprisingly, those 'actual (subjective) expectations of privacy' 'that society is prepared to recognize as "reasonable," ' bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable." (citations omitted)).

¶105 Lastly, it could be argued that the cases are distinguishable in that the government (through its agent) was a party to the conversations in *Hoffa* but was a third-party intruder

on the conversation in *Katz*. However, neither Hoffa nor the defendant in *Katz* knew whether the persons to whom they were speaking were *in fact* government agents; and, as noted, it is implausible that an individual's expectation of privacy would turn on a fact of which she is unaware. It is also untenable that the government could nullify a person's right of privacy in her communications through the mere expedient of deceiving the person as to the auditor's police connections. The waiver of a constitutional right must be made knowingly and voluntarily. *State v. McCarthy*, 2004 MT 312, ¶ 32, 324 Mont. 1, 101 P.3d 288. Likewise, consent to a warrantless search must be given knowingly and voluntarily. *State v. Bieber*, 2007 MT 262, ¶ 29, 339 Mont. 309, 170 P.3d 444. To be voluntary, the waiver or consent must be "the product of a free and deliberate choice rather than intimidation, coercion, or *deception*." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986) (emphasis added). Accordingly, a person does not voluntarily waive her right of privacy in her communications or consent to a warrantless search where the government uses deception to gain access to those communications. Bottom line: Whether the government uses pretense to acquire statements made directly to an agent masquerading as a confidant, or whether the government secretly listens in on statements the person makes to a nongovernmental party, her privacy is invaded without her knowledge or consent. As noted, an invasion of privacy is effected where the intimacies of the person are tapped, recorded, extracted, or revealed—whether that involves in-person deception (*Hoffa*) or stealth tactics (*Katz*). But more to the point of this concurrence, both techniques are used to extract evidence from the person and, thus,

61

constitute "searching." Indeed, that the government is looking for evidence is reflected by the fact that it is using artifice or surreptitious methods to gain access to what it seeks.

*White*

¶106　The last case in this discussion is *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122 (1971). The issue there was whether the Fourth Amendment barred the testimony of government agents about conversations which had occurred between the defendant and a government informant (Jackson) and which the agents had overheard by means of a radio transmitter carried by Jackson and concealed on his person. On four occasions, the conversations took place in Jackson's home, and each of these conversations was overheard by an agent outside using a radio receiver. Four other conversations—one in the defendant's home, one in a restaurant, and two in Jackson's car—were overheard by the use of radio equipment. The prosecution was unable to locate and produce Jackson at trial, and the trial court overruled objections to the agents' testimony.

¶107　On appeal, a plurality of four (Justice White, joined by Chief Justice Burger and Justices Stewart and Blackmun) concluded that the electronic surveillance did not violate the Fourth Amendment because it did not invade a constitutionally justifiable expectation of privacy. More specifically, the plurality concluded that an individual does not have a constitutionally justifiable expectation that the person to whom she is speaking is not recording or transmitting the conversation to government agents. This conclusion was premised not on a plain-language interpretation of the Fourth Amendment, but rather on the privacy expectations that the Supreme Court itself had created during the preceding

two decades through its decisions in *On Lee*, *Lopez*, *Hoffa*, and *Lewis v. United States*, 385 U.S. 206, 87 S. Ct. 424 (1966). I have already discussed the first three of these decisions. As for *Lewis*, a federal narcotics agent, by misrepresenting his identity and stating his willingness to purchase narcotics, was invited into the defendant's home where an unlawful narcotics transaction was consummated. Thereafter, the narcotics were introduced at the defendant's criminal trial over his objection. The Supreme Court held that this did not violate the Fourth Amendment, explaining that when,

> as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.

*Lewis*, 385 U.S. at 211, 87 S. Ct. at 427.

¶108 Based on these decisions, Justice White (speaking for the *White* plurality) pointed out that regardless of "what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions," the fact remains that, "[s]o far, the law permits the frustration of actual expectations of privacy by . . . authorizing the use of informants in the manner exemplified by *Hoffa* and *Lewis*." *White*, 401 U.S. at 752, 91 S. Ct. at 1126. Indeed, the starting premise of Justice White's analysis was this: "Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with

63

the defendant and without otherwise violating the latter's Fourth Amendment rights." *Id.* at 751, 91 S. Ct. at 1125-26 (citing *Hoffa*). He then reasoned that

> [i]f the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy [*Hoffa*], neither does a simultaneous recording of the same conversations made by the agent [*Lopez*] or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks [*On Lee* and *White*].
> . . . If the law gives no protection to the wrongdoer whose trusted accomplice is . . . a police agent [*Hoffa*], neither should it protect him when that same agent has recorded [*Lopez*] or transmitted [*On Lee* and *White*] the conversations which are later offered in evidence to prove the State's case.

*Id.* at 751-52, 91 S. Ct. at 1126.

¶109 Justice White thus implicitly disagreed with Justice Brennan's contention in his *Lopez* dissent that there are constitutionally significant distinctions between electronic surveillance and conventional police stratagems. Indeed, Justice White argued that a person, in deciding whether to speak to a companion, would not distinguish between a possible government informer on the one hand and a possible government informer with a recorder or transmitter on the other. In fact, it is doubtful that Allen would have drawn such a distinction in the present case in deciding whether to speak to Golie.

> Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition . . . .

*Id.* at 752, 91 S. Ct. at 1126.

¶110  Finally, Justice White noted that an electronic recording "will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent." *Id.* at 753, 91 S. Ct. at 1126.  And, similar to Justice Harlan's reasoning in *Lopez*, he rejected the notion "that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question."  *Id.* at 753, 91 S. Ct. at 1126-27.  Thus, for the foregoing reasons, Justice White concluded that it is "untenable to consider the activities and reports of the police agent himself, though acting without a warrant, to be a 'reasonable' investigative effort and lawful under the Fourth Amendment but to view the same agent with a recorder or transmitter as conducting an 'unreasonable' and unconstitutional search and seizure." *Id.* at 753, 91 S. Ct. at 1127.

¶111  While there is logic in this reasoning, it must be kept in mind that Justice White's conclusion was based on the plurality's subjective view of "what expectations of privacy are constitutionally 'justifiable,' " *id.* at 752, 91 S. Ct. at 1126 (citing *Katz*), which in turn was based on what the Court had said was permissible in its prior decisions in *On Lee*, *Lopez*, *Hoffa*, and *Lewis*—particularly the holdings in *On Lee* and *Hoffa* that the police may extract verbal evidence from people by means of in-person stratagems without a warrant.  Thus, in order to reach the same conclusion as the plurality, one must accept the propositions that (1) whether a "search" has occurred depends on whether the defendant had an expectation of privacy that was constitutionally justifiable; (2) the police may, without a warrant, surreptitiously seek out verbal evidence from a person by means of an

informant or undercover agent who is not equipped with electronic equipment but who instead remembers and testifies as to what was said; (3) there is no constitutionally material difference where that same agent is equipped with electronic equipment that simultaneously records or transmits the conversation; and (4) hence, any expectation an individual has that the person to whom she is speaking will not repeat, record, or transmit her conversation at the government's behest is not constitutionally justifiable.

¶112 Regardless of the validity of the second, third, and fourth of these propositions (and I do not concede their validity), I cannot agree with the first. "The *Katz* test—whether the individual has an expectation of privacy that society is prepared to recognize as reasonable—has often been criticized as circular, and hence subjective and unpredictable." *Kyllo v. United States*, 533 U.S. 27, 34, 121 S. Ct. 2038, 2043 (2001) (citing critics). But even more problematic, I believe the test conflates the question of "privacy" with the question of "search." As noted, these are two separate rights (*see* ¶ 94, *supra*); and it is implausible that the question of whether there has been a "search" turns not on what the government was doing, but rather on what the subject of that search expected with respect to her right of "privacy" (more specifically, whether her privacy expectation was constitutionally justifiable or one that society, presumably, is prepared to recognize as reasonable). Again, a "search" is "an endeavor to find, ascertain, recover, or the like; . . . hence, pursuit with a view to finding, etc." *Webster's New International Dictionary of the English Language* 2257 (2d ed. 1934); *see also e.g. Arthun*, 274 Mont. at 88, 906 P.2d at 220 (a "search" is " 'a prying into hidden places for that which is

concealed' "). And to "search" means " '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.' " *Kyllo*, 533 U.S. at 32 n. 1, 121 S. Ct. at 2042 n. 1 (quoting N. Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989)). When the government engages in such activity, it is conducting a "search"—irrespective of whether we may think that society is prepared to recognize the person's expectation of privacy as reasonable.

¶113 Notably, in the course of his analysis, Justice White distinguished the outcome in *Katz* on the ground that "*Katz* involved no revelation to the Government by a party to conversations with the defendant." *White*, 401 U.S. at 749, 91 S. Ct. at 1124-25. The apparent meaning of this statement, as Justice White later explained in his opinion for the Court in *United States v. Karo*, 468 U.S. 705, 716 n. 4, 104 S. Ct. 3296, 3304 n. 4 (1984), is that there is no search when the government's agent or informant consents to having the conversation with the suspect monitored (*On Lee* and *White*) but there is a search when neither party consents (*Katz*). I find this reasoning untenable. For one thing, as noted above (*see* ¶ 105, *supra*), it is absurd that the government can "consent" to its own monitoring of a conversation and thereby vitiate the speaker's right of privacy and nullify the warrant requirement. This approach, moreover, cannot be sustained under *Katz*'s expectations test. "Expectations are formed on the basis of objective appearances, not on the basis of facts known only to others. . . . [A person's] expectation of privacy is either inherently reasonable or it is inherently unreasonable. [The auditor's] undisclosed status as a government informant cannot alter the reasonableness of that expectation." *Karo*,

468 U.S. at 724, 104 S. Ct. at 3308 (O'Connor & Rehnquist, JJ., concurring in part and concurring in the judgment).

¶114   Justice Black concurred in the judgment in *White* on the ground that the Fourth Amendment does not apply to eavesdropping. *White*, 401 U.S. at 754, 91 S. Ct. at 1127 (citing his dissent in *Katz*). Justice Brennan concurred in the result on the ground that *Katz* did not apply retroactively to the electronic surveillance at issue. *Id.* at 755, 91 S. Ct. at 1127. And Justices Douglas, Harlan, and Marshall dissented. *Id.* at 756-96, 91 S. Ct. at 1128-48. Of relevance to this discussion is Justice Harlan's dissent.

¶115   Justice Harlan disputed the plurality's contention that if A can relay verbally what is revealed to him by B (as in *Lewis* and *Hoffa*), or record and later divulge it (as in *Lopez*), then A can contemporaneously transmit to it another. Justice Harlan argued that "it is one thing to subject the average citizen to the risk that participants in a conversation with him will subsequently divulge its contents to another, but quite a different matter to foist upon him the risk that unknown third parties may be simultaneously listening in." *Id.* at 777, 91 S. Ct. at 1138. He explained this view as follows:

> The impact of the practice of third-party bugging, must, I think, be considered such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society. It goes beyond the impact on privacy occasioned by the ordinary type of "informer" investigation upheld in *Lewis* and *Hoffa*. The argument of the plurality opinion, to the effect that it is irrelevant whether secrets are revealed by the mere tattletale or the transistor, ignores the differences occasioned by third-party monitoring and recording which insures full and accurate disclosure of all that is said, free of the possibility of error and oversight that inheres in human reporting.

Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates daily life. Much off-hand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.

*Id.* at 787-89, 91 S. Ct. at 1143-44 (footnotes omitted).

¶116   Yet, while it may be true, for the reasons stated by Justice Harlan, that third-party bugging has a unique effect on privacy and security (as compared to "the ordinary type of 'informer' investigation upheld in *Lewis* and *Hoffa*") and, thus, poses a different "risk" to the average citizen, I do not believe such considerations are pertinent to the question of whether a "search" has occurred. Just because one evidence-gathering technique has the potential to create a greater chilling effect on speech than another does not mean that the former constitutes looking for evidence and the latter does not—unless we are to determine the "search" question based on the utility and desirability of a particular law enforcement practice.

¶117   That, in fact, is what Justice Harlan proposed. He acknowledged that the risk approach of *Lewis*, *Lopez*, and *On Lee* and the expectations approach of *Katz* "have their limitations and can, ultimately, lead to the substitution of words for analysis." *White*, 401 U.S. at 786, 91 S. Ct. at 1143. He suggested, therefore, that judges should not "recite the

expectations and risks without examining the desirability of saddling them upon society."

*Id.* The "critical question," he proposed, is this:

> whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement. This question must, in my view, be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement.

*Id.* (paragraph break omitted). For the reasons quoted above, Justice Harlan concluded that we should *not* impose on our citizens the risks of third-party electronic monitoring. *See id.* at 790, 91 S. Ct. at 1145.

¶118 I disagree with this approach for a number of reasons, not the least of which is that it is even more arbitrary and subjective than the original formulation of the *Katz* test. It is a dubious assumption in the first place that courts are qualified to divine whether society is prepared to recognize a particular expectation of privacy as reasonable. But it is even more doubtful that courts should be judging the "utility" of a particular police practice and deciding whether the likely extent of its impact on the individual's sense of security is enough to justify requiring a warrant. Most importantly, however, as noted above, whether the police are looking for evidence is not answered by whether we should impose a particular "risk" on our citizens. Again, a "search" is a pursuit with a view to finding something, and to "search" means to look over or through for the purpose of finding something. "Risks" and "expectations" simply are not part of the equation.

¶119 Turning now to Montana law, our caselaw on the issue of warrantless electronic monitoring and recording with the consent of the informant or agent (i.e., warrantless participant monitoring/recording) is summarized in ¶¶ 15-22 of *State v. Goetz*, 2008 MT 296, 345 Mont. 421, 191 P.3d 489, and ¶¶ 36-43 of today's Opinion. I am not going to review all of those cases in detail here, but will briefly discuss *State v. Brackman*, 178 Mont. 105, 582 P.2d 1216 (1978), and *Goetz*.

¶120 In *Brackman*, we followed the approach suggested by Justice Harlan in his *White* dissent and, thus, "weigh[ed] what effect a decision favorable to the defendant would have on law enforcement abilities against this intrusion of privacy and what consequent effect that may have on freedom of speech." *Brackman*, 178 Mont. at 115, 582 P.2d at 1221. Doing so, a majority of the Court decided that monitoring or recording a conversation, even with the informant's consent, requires a warrant. Notably, the majority evidently agreed with Justice Harlan's view that electronically monitoring a conversation is a greater invasion of privacy than merely using an unwired informant. *See id.* (noting the defendant's assertion that to allow warrantless participant monitoring would have a "chilling" effect on citizen discourse); Opinion, ¶ 37.

¶121 Our subsequent cases strayed from the analysis used in *Brackman* and aligned themselves instead with the views of the *White* plurality. *See e.g. State v. Coleman*, 189 Mont. 492, 616 P.2d 1090 (1980); *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988); *see also Goetz*, ¶ 22. In *Goetz*, however, we examined the issue anew and decided that warrantless electronic monitoring and recording of a defendant's conversation with an

71

informant violates Article II, Sections 10 and 11 of the Montana Constitution, despite the informant's consent to the monitoring. We framed our analysis in terms of the *Katz* test and asked (1) whether the defendants had actual subjective expectations of privacy and, if so, (2) whether society was willing to recognize the defendants' expectations of privacy as reasonable. *Goetz*, ¶¶ 25-37. Under the first prong, we concluded that the defendants did have actual subjective expectations of privacy in their conversations. *Goetz*, ¶ 30. And under the second prong, we concluded that society was willing to recognize these expectations as reasonable. *Goetz*, ¶ 37. More specifically, we asserted that Montanans "are willing to risk that a person with whom they are conversing in their home or other private setting may repeat that conversation to a third person" but "are unwilling to accept as reasonable that the same conversation is being electronically monitored and recorded by government agents without their knowledge." *Goetz*, ¶ 35. We cited no authority for the first half of this assertion; but with respect to the second, we relied on statements made by various delegates to the 1972 Montana Constitutional Convention regarding the government's use of electronic surveillance. *Goetz*, ¶¶ 33-35. In today's decision, the Court likewise relies on the delegates' comments, as well as the views expressed by Justices Douglas and Harlan in *White* that to allow electronic monitoring and recording of conversations would kill free discourse and undermine people's confidence and sense of security in dealing with one another. Opinion, ¶¶ 54-57.

### "Search" Redefined

72

¶122   I signed our *Goetz* decision and agree with much of the Court's analysis under Issue 2 of today's decision because I believe they both correctly apply the law as it presently stands.  However, for the reasons set forth above and reiterated below, I believe that the present law—in particular, the *Katz* approach to search analysis—is incorrect and must be changed.

¶123   As noted, the "expectations" approach is problematic for a number of reasons.  For one thing, the test is circular in that our expectations and the risks we assume are the product of what the law allows while the law, conversely, is the manifestation of our values and expectations.  *See* ¶¶ 93, 104, *supra*.  If the Legislature passed a law making it unlawful for anyone to record a conversation without the knowledge of all parties to the conversation, one could argue that society is prepared to recognize as reasonable a privacy expectation against the surreptitious recording of conversations—which Allen in fact argues here based on § 45-8-213(1)(c), MCA.  But what if the Legislature repealed that law?  Or, better yet, what if the Legislature excepted the police from the law's coverage and adopted a resolution stating that society is unwilling to recognize as reasonable an expectation against warrantless participant monitoring and recording?  Would this law violate our decision in *Goetz*, or would it overrule *Goetz* by clarifying that society's expectations are not what we thought they were?  Is the Legislature better suited to say whether society is prepared to recognize a particular expectation of privacy as reasonable?  Do the protections of the Fourth Amendment and Article II, Sections 10 and 11 vacillate with the prevailing political winds?

73

¶124   Even our own decisions can have the same effect.  Prior to *Goetz*, any expectation that the government first had to obtain a warrant in order to monitor or record a person's conversations with an informant was arguably unreasonable, due to authorities such as *Coleman* and *Brown*.  In this regard, the State points out that "[i]t is illogical that society would view as reasonable a privacy expectation that conflicted with established law."  Of course, it's possible that this expectation *was* reasonable but that we failed to recognize that fact in *Coleman* and *Brown*, which would highlight yet another flaw in the approach: this Court's inability to discern accurately which privacy expectations society is prepared to recognize as reasonable.  But, in any event, such an expectation is now reasonable under the authority of *Goetz*.  The reason:  We simply decided in *Goetz* that society was prepared to recognize as reasonable an expectation that the government is not monitoring or recording our conversations, regardless of the auditor's consent.

¶125   This points up another problem with the test:  How do we know whether society is prepared to recognize a particular expectation as reasonable?  Is it possible to know this without surveying our citizens?  Do the parties need to provide us with concrete evidence of society's views on the matter?  The Court's lack of citation to any such evidence in the present case reflects the fact that none was presented.  Allen cites an "empirical study," but the State points out that this study is inapposite to the issue of participant recording. And while a handful of Convention delegates commented on the issue almost 40 years ago, their views are certainly open to more than one interpretation, as Justice Rice's Dissent reflects.  *See also e.g. Keller v. Smith*, 170 Mont. 399, 408-09, 553 P.2d 1002,

74

1008 (1976) ("[W]e have not relied on the minutes of the Constitutional Convention proceedings as indicative of the intent of the delegates. We have purposely refrained from using this basis of interpretation as excerpts from various portions of these minutes, among other things, can be used to support either position, or even a third position . . . ."). The reality is that the privacy expectations which society is prepared to recognize as reasonable are simply the privacy expectations that a majority of the members of this Court decide are reasonable. Again, I disagree with the premise that the constitutional protections were intended to be left to the whims of judges who may think that one expectation of privacy is objectively reasonable and another is not.

¶126 Finally, aside from the impracticality of the test, the reasonableness of a person's expectation of privacy does not, in my view, tell us whether the police are conducting a "search." As explained above, the "expectations" test evolved in the Supreme Court's *Lopez*, *Hoffa*, and *Katz* decisions as a method for determining whether a defendant's right of "privacy" had been infringed. In fact, under federal law, "privacy" analysis has totally supplanted "search" analysis. And since this Court has adopted wholesale the Supreme Court's approach, as summarized by Justice Harlan in his *Katz* concurrence, there is no distinct "search" analysis under Montana law either.

¶127 Yet, there should be. As noted, I do not agree with the proposition that the right of "privacy" and the right against unreasonable "searches" are one and the same. *See* ¶ 94, *supra*. And the Montana Constitution, in fact, treats "privacy" and "searches" *separately*. Article II, Section 10 ensures the right of individual privacy, but Article II, Section 11

ensures a substantively different right: the right to be secure in one's person, papers, home, and effects from unreasonable searches. It is error to treat these two provisions as creating just one single right of "privacy."

¶128 Thus, while an analysis of "risks" or "expectations" may be relevant for resolving questions of "privacy," it is not, in my view, proper for resolving questions of "search." Again, as pointed out before, a "search" is "an endeavor to find, ascertain, recover, or the like; . . . hence, pursuit with a view to finding, etc." *Webster's New International Dictionary of the English Language* 2257 (2d ed. 1934); *see also e.g. Arthun*, 274 Mont. at 88, 906 P.2d at 220 (a "search" is " 'a prying into hidden places for that which is concealed' "). And to "search" means " '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.' " *Kyllo*, 533 U.S. at 32 n. 1, 121 S. Ct. at 2042 n. 1. The fallacy of the *Katz* test is that it very deftly shifts the focus from what the government is doing—looking for evidence—to what society accepts, or what the courts deem reasonable, or whether the evidence-gathering technique is utilitarian. In accordance with the plain meaning of the word "search," I would put the focus back on what the government is doing and hold that a search occurs where a government agent looks over or through, explores, examines, inspects, or otherwise engages in conduct or an activity designed to find, extract, acquire, or recover evidence. A few additional observations about this approach are necessary.

¶129 First, the protection guaranteed by Article II, Section 11 is that the "people" shall be "secure" in their "persons, papers, homes and effects" from unreasonable searches.[4] Thus, the protection applies to "people," not places, and is only triggered when the government's searching involves an individual's person, papers, homes, or effects. Moreover, if the individual knowingly chooses to expose her person, papers, home, or effects to the public or to someone she knows to be a law enforcement agent, then she cannot complain that her "security" has been infringed. For this reason, I would distinguish situations where the speaker knows he is talking to a government agent (e.g., *Lopez*) from situations where the agent's connections to the police are kept hidden (e.g., *On Lee*, *Hoffa*, and *White*). *Cf. United States v. Stringer*, 535 F.3d 929, 939 (9th Cir. 2008) ("[A] search is unreasonable, even if consensual, if the consent is obtained by trickery or deceit."); ¶ 105, *supra* (explaining that consent to a warrantless search must be given voluntarily, i.e., must be the product of a free and deliberate choice rather than intimidation, coercion, or deception).

¶130 Second, it is important to note that this approach does not require us to judge the "utility" of a particular police practice. It simply requires that when the practice involves finding, extracting, acquiring, or recovering evidence from a person, the police must first procure a warrant (or the person's consent) and the search must be otherwise reasonable. Also, in this regard, I do not propose to outlaw all police stratagems and all monitoring or

---

[4] Searches conducted without a warrant are per se unreasonable, subject to only a few carefully drawn exceptions. *Arizona v. Gant*, ___ U.S. ___, ___, 129 S. Ct. 1710, 1716 (2009); *State v. Hurlbert*, 2009 MT 221, ¶ 19, 351 Mont. 316, 211 P.3d 869.

recording of conversations by the police. Rather, my argument is that the Constitution requires that those activities be conducted with a warrant, absent there being an established and well-recognized exception to the warrant requirement.

¶131 Lastly, search analysis in Montana is typically conducted under Article II, Section 11 in conjunction with Article II, Section 10. *See State v. Cotterell*, 2008 MT 409, ¶ 25, 347 Mont. 231, 198 P.3d 254; *Goetz*, ¶¶ 25-27. The latter states that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II, § 10. Based on this provision, we have said that Montanans enjoy "greater protections against governmental intrusions" than those provided under the United States Constitution. *State v. Graham*, 2007 MT 358, ¶ 12, 340 Mont. 366, 175 P.3d 885. I would continue to recognize these greater protections when conducting search analysis under Section 11.

## Allen and Golie's Telephone Conversation

¶132 Applying these principles to Allen and Golie's telephone conversation, there is no question that Golie was a government agent who was enlisted to aid in an investigation of Allen, which included surreptitiously recording her telephone conversations with him. Hence, the State was engaged in acquiring verbal evidence from Allen and, thus, was conducting a "search." That the State was endeavoring to find something (in particular, Allen's thoughts and communications about illegal activity) is reflected in the fact that it had to use surreptitious methods in order to gain access to what it sought.

78

¶133 Allen did not knowingly choose to expose his verbalized thoughts to the public generally or to law enforcement specifically. In this connection, I reject the notion that Golie's so-called "consent" to record her conversations with Allen at the behest of the police nullified the warrant requirement. It is axiomatic that Golie cannot waive Allen's right against unreasonable searches under Article II, Section 11 (or, for that matter, his right of privacy under Article II, Section 10) any more than he can waive hers. I also reject the proposition that Allen surrendered his right against unreasonable searches just because he communicated his thoughts to Golie. It is well-established by cases such as *Silverman*, *Wong Sun*, *Katz,* and *Goetz* that the constitutional protections encompass verbalized thoughts.

¶134 Finally, law enforcement's evidence-gathering activities here resulted in two types of evidence: Golie's testimony about her conversation with Allen, and the recording she made of that conversation. Both, in my view, are the product of an unlawful warrantless search and, thus, both are subject to suppression. As discussed above, I am not persuaded that one type of evidence is the result of a search and the other is not. Such a distinction depends on ad hoc judgments about "risks," "expectations," and the desirability of the particular police practice used. These considerations have no bearing on the question of whether a "search" has occurred.

¶135 In conclusion, for the purpose of conducting search analysis under Article II, Section 11, I believe we should jettison the *Katz* test in favor of a plain interpretation of

the word "search." Applying that here, I conclude that enlisting Golie to acquire evidence against Allen was a search requiring a warrant.

### III. Exclusionary Rule Analysis

¶136 The second primary point addressed in this concurrence concerns application of the exclusionary rule to Golie's testimony about her conversation with Allen. For the reasons just discussed, I conclude that this evidence was the product of an unlawful warrantless search. But that conclusion aside, I believe Golie's testimony should be subject to the exclusionary rule as well.

¶137 "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536, 108 S. Ct. 2529, 2533 (1988) (citations omitted). The purpose of the exclusionary rule is to deter illegal police conduct and constitutional violations and to preserve judicial integrity. *State v. Ellis*, 2009 MT 192, ¶ 48, 351 Mont. 95, 210 P.3d 144; *Virginia v. Moore*, 553 U.S. 164, 178, 128 S. Ct. 1598, 1608 (2008) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85, 488, 83 S. Ct. 407 (1963)). "The exclusionary prohibition extends as well to the indirect as the direct products of [unlawful searches]." *Wong Sun*, 371 U.S. at 484, 83 S. Ct. at 416.

¶138 In the instant case, as in *Goetz*, it is undisputed that Golie, a confidential informant, was acting as an agent of the State when she surreptitiously recorded her cell phone conversation with Allen at the behest of law enforcement. The Court holds that

this warrantless recording of the conversation violated Allen's right to be free from unreasonable searches and seizures under Montana's Constitution, Article II, Section 11, as bolstered by the right of individual privacy, Article II, Section 10. Opinion, ¶ 64. The Court thus directs that the recording may not be admitted into evidence in the event of a retrial. Opinion, ¶ 65.

¶139 Yet, while we suppress the recording itself, the Court leaves open the possibility that the agent who unlawfully made it can still be called to testify personally about the substance of the recording. The recording is suppressed; its contents are not. In my view, however, Golie's testimony ought to be suppressed as well. Allen's right to be free from unreasonable searches and invasions of privacy is compromised not only by the admission of the warrantless recording, but, equally so, by the testimony of the government agent as to her recollections of what was said in the conversation. If the government acquires verbal evidence by means of a warrantless search, then suppressing the *recording* of the conversation, but not the conversation itself, effectively eviscerates the rights sought to be protected. Our decisions today and in *Goetz* go only half way; they stop short of fully protecting the right of individual privacy and the right to be free from unreasonable searches.

¶140 As noted at the outset, this approach of suppressing the recording, but not the conversation itself, is akin to suppressing evidence obtained by means of an unlawful entry into the defendant's home, but then allowing the officers to testify about that evidence and the fact that they found it in the defendant's home. While the Court asserts

81

that this analogy fails, *see* Opinion, ¶ 65 n. 2, it appears that the Court has simply missed the point. Allowing an agent to testify about evidence which he acquired through an illegal search, and which has therefore been suppressed, defeats the purpose of the exclusionary rule—which, it must be recalled, is intended to deter constitutional violations, applies to indirect as well as direct evidence, and includes knowledge acquired during an unlawful search. Obviously, there is little, if any, deterrent when the prosecution is permitted to introduce otherwise excluded evidence through the mere expedient of having one of its witnesses describe that evidence to the jury. In this regard, we must not forget that Allen's objection is not so much to the recording itself as it is to *the contents* of the recording. Surely we would not be here debating this issue if all that Golie had managed to record was perfectly innocuous statements. Again, it is the evidence of his inculpatory statements which Allen seeks to suppress. And if the mechanical evidence of those statements must be suppressed as the product of a constitutional violation, then so too should the verbal evidence (i.e., the agent's testimony about them) if the exclusionary rule is to serve its function.

¶141 Notably, the Court proffers a distinction between the illegal intrusion in my hypothetical and the illegal intrusion in the present case. The Court suggests that whereas my hypothetical officer would not have been in the house to make his observations but for his illegal entry, Allen invited Golie to participate in a conversation with him and, thus, she was lawfully present to hear his verbalized thoughts. Her illegal act, according to the Court's holding under Issue 2, was to record those thoughts as they

82

were being expressed. Thus, since "Golie's engaging in a cell phone conversation with Allen is not poisoned by the fact of the recording," Opinion, ¶ 65 n. 2, we presumably need not suppress her testimony about the conversation under the exclusionary rule.

¶142 For reasons discussed in Part II above, I suggest that the "poisonous tree" in cases such as this is not the mere fact of the recording. Rather, it is the fact of gathering evidence from the defendant without a warrant, with the recording being just one fruit on that tree. Nevertheless, *for purposes of the present case*, treating "the fact of the recording" as the poisonous tree is arguably correct, given that Allen requested suppression of only the recording, and not Golie's testimony about their conversation. However, the Court's dictum on this matter—consisting of two conclusory sentences at the end of a footnote regarding an issue that wasn't even raised—is far from a holding. In this regard, and for clarification, I note that my argument herein is not that we should grant Allen relief that he did not request. Rather, the purpose of this concurrence is to point up the problematic aspects of the *Katz* "expectations" test and the illogicality of suppressing the recording but not the agent's testimony. Ultimately, a definitive holding on the question of whether the State's warrantless acquisition of a person's verbalized thoughts is unlawful, whether or not a recording device is used, must await a future case where the issue is squarely presented for decision.

## IV. Conclusion

¶143 The rule we should adopt for search-and-seizure analysis is a simple one. When the government looks over or through, explores, examines, inspects, or otherwise engages

83

in conduct designed to find, extract, acquire, or recover evidence, it is a "search," and when the search implicates an individual's person, papers, homes, or effects, it must be conducted with a warrant or in reliance on one of the well-recognized exceptions to the warrant requirement. Whether the courts deem the defendant's expectation of privacy as reasonable and whether we believe the evidence-gathering technique is sufficiently utilitarian are not part of the equation. Likewise, it does not matter whether the search is conducted by law enforcement directly or, as here and in *Goetz*, indirectly by means of government agents. Finally, *all evidence* gathered as a result of an illegal search must be suppressed. Where verbal evidence is concerned, that includes the conversations themselves as well as the recordings of the conversations. Both are evidence obtained by constitutionally impermissible means.[5]

¶144 If Article II, Section 11 means anything, this constitutional right requires scrupulous adherence to the warrant requirement when the government engages in evidence-gathering activities which implicate an individual's person, papers, home, or effects. That constitutional mandate is not lessened, and cannot be avoided, by using an agent to obtain evidence which the government could not obtain directly through a law

---

[5] As a corollary to this, I have previously argued that an officer's personal, direct observations made independently of the warrantless audio or visual recordings would not necessarily have to be excluded, though his characterizations of the recording's substance should be. *See State v. Foston*, 2009 MT 191, ¶¶ 22-25, 351 Mont. 85, 209 P.3d 262 (Nelson, J., specially concurring). Notably, at the *Foston* oral argument, in response to questioning from the Court, the Attorney General assured the Court that "post-*Goetz*, we wouldn't be getting into this sort of thing"—i.e., an officer testifying as to the substance of an illegally obtained recording—"because under *Goetz*, we need a warrant to get into any evidence regarding electronic surveillance." *See Foston*, ¶ 27.

enforcement officer. How and through whom the government conducts its evidence-gathering activities and what form the government uses to preserve the evidence it acquires (whether a recording or the agent's memory) are immaterial. Without a warrant, all evidence gathered by the government as a result of the warrantless and illegal search should be suppressed.

¶145 I specially concur.

/S/ JAMES C. NELSON

Justice Jim Rice, concurring in part and dissenting in part.

¶146 I concur with the Court's resolution of Issues 1 and 3, but dissent from Issue 2.

¶147 After Allen lured Louis Escobedo to Golie's vehicle and violently attacked him, which included discharging a gun next to Escobedo's head and pistol whipping him until he was unconscious and bleeding profusely from a head wound, Allen spoke about his actions to Golie over the telephone. Golie, working with the police, thereafter recorded her cell phone conversations with Allen. On the recording, Allen can be heard talking with other people on numerous occasions during his conversations with Golie, all the while downplaying the assault by claiming he had merely inflicted a "*cut*" on Louis's "*hand*." Allen clearly had no intention of engaging in a private conversation because he knowingly exposed his admissions about the assault to others during these conversations. "What a person knowingly exposes to the public is not protected . . . ." *State v. Scheetz,*

85

286 Mont. 41, 49, 950 P.2d 722, 726-27 (1997) (quoting *State v. Bullock*, 272 Mont. 361, 375, 901 P.2d 61, 70 (1995)).

¶148 Despite these facts, the Court extends the decision in *State v. Goetz*, 2008 MT 296, 345 Mont. 421, 191 P.3d 489, and finds that Allen exhibited a subjective expectation of privacy in his cell phone conversations with Golie, and that society would be willing to recognize Allen's expectations as reasonable, pursuant to Article II, Sections 10 and 11 of the Montana Constitution. In doing so, the Court ignores U.S. Supreme Court precedent, overrules long-standing and well-established Montana precedent, and disregards the clearly expressed intentions of the 1972 Constitutional Convention delegates.

¶149 In *U.S. v. White*, the Supreme Court held that the Constitution "permit[s] authorities to use the testimony of those associates who for one reason or another have determined to turn to the police, as well as by authorizing the use of informants . . . ." The *White* Court explained that, "[i]f the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case." *U.S. v. White*, 401 U.S. 745, 752, 91 S. Ct. 1122, 1126 (1971) (citing *Lopez v. U.S.*, 373 U.S. 427, 83 S. Ct. 1381 (1963)). The *White* decision, announced a year prior to the Montana Constitutional Convention, was intimated by the delegates throughout their statements regarding the privacy clause, demonstrating they were certainly aware of *White*'s holding, as further noted below. The

Supreme Court reaffirmed *White*'s principles in *U.S. v. Caceres*, holding that "[n]either the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants."[1] *U.S. v. Caceres*, 440 U.S. 741, 744, 99 S. Ct. 1465, 1467 (1979). However, the Court rejects *White* and its progeny, and instead cites the dissenting opinions of Justices Harlan and Douglas in that case. Opinion, ¶¶ 37, 56.

¶150 Then, to justify its departure from these principles, the Court offers that Montana's constitutional right to privacy was intended to be broader than the federal Constitution on this issue. However, for over three decades our own jurisprudence has followed the principles established in *White*, holding that the Montana Constitution, including the right to privacy, does not protect defendants from electronic recordings of their conversations when one party to the conversation consents. *State v. Hanley*, 186 Mont. 410, 608 P.2d 104 (1980); *State v. Coleman*, 189 Mont. 492, 616 P.2d 1090 (1980); *State v. Canon*, 212 Mont. 157, 687 P.2d 705 (1984); *State v. Solis*, 214 Mont. 310, 693 P.2d 518 (1984); *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988); *State v. Jones*, 2008 MT 440, 347 Mont. 512, 199 P.3d 216. The Court reasons that these decisions were "flawed" with "analytical shortcomings," necessitating a reassessment. Opinion, ¶¶ 35, 43. The Court then abrogates the previous decisions from this Court, spanning more than thirty years,

---

[1] All federal Circuit Courts of Appeals have accepted *White* as constitutional authority for the principle that search warrants are not required to authorize electronic recording when one party to the conversation consents. *See State v. Brown*, 232 Mont. 1, 9, 755 P.2d 1364, 1369-70 (1988) (citing C. Fishman, *Wiretapping and Eavesdropping* § 9, 17 (1978)).

on the notion that the current Court has discerned the correct meaning of the Montana Constitution.

¶151 However, the Court's decision today clearly conflicts with the expressed intention of the Constitutional Convention delegates regarding the right to privacy. First, when debating the privacy clause, the delegates discussed an outright ban upon third party (without consent) wiretapping and electronic surveillance, but rejected this proposal. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1682-83 (Delegate Campbell).

¶152 Then, Delegate Robinson, seeking a stronger right to privacy, offered an amendment which would have added "Privacy of communications shall be inviolate" to the Constitution. Delegate Holland opposed the amendment, suggesting the number of actions which would be prohibited by such an amendment, including recording or searching of obscene phone calls and telegrams. Delegate Campbell offered a counter-proposal to weaken Delegate Robinson's amendment, explaining that the convention should not be:

> excluding the legitimate law enforcement people who, with the consent of one party, the person who is being threatened by phone calls and things like this, to act on behalf of that victim. The privacy of that individual certainly could be waived with his or her consent, and there's certainly no privacy toward the obscene caller. I feel that this would not hinder law enforcement in that respect at all . . . . ***The federal law does provide a number of areas for wiretapping. They certainly are available; they could be used.***

Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1685 (emphasis added). Delegate Melvin echoed these concerns, and Delegate Dahood, who had chaired the Bill of Rights Committee, offered an answer to a question about whether the privacy provisions would interfere with recording of obscene phone calls—and noted the significance of one party's consent:

> First of all, this does not in any way relate to the obscene phone call situation, nor does it relate to the ability of the telephone company to make the traces. The logic and the reason is this: all personal rights, constitutional or otherwise, may be waived. Lady A is receiving the obscene phone call. She waives her right and grants the telephone company the right to intercept that communication. The individual that's making the call does not have the right of privacy with respect to violating the law and making the obscene phone calls, so as a consequence, we are not interfering with anyone's rights by having the telephone company attempt to intercept and discover and determine who the caller is; we are protecting the right of privacy.

Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1686. Then, perhaps most tellingly, Delegate Robinson conceded, in response to a question, that telephone conversations with one consenting party would not be deemed private, even under her stronger privacy amendment:

> Oh, no. You're – there's a difference between your knowing that you're telling me and you know whether there is someone around us listening or if it's just you and I; *whereas, on the telephone, you may tell me that and you may suspect that I'm the only one listening, but you certainly may not know that.*

Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1686 (emphasis added). Delegate Robinson eventually withdrew her amendment to the

privacy clause, leaving the clause intact and as originally proposed by the Bill of Rights Committee.

¶153   These statements by the Constitutional Convention delegates on the specific issue before us are virtual echoes of the statements in *White*, 401 U.S. at 752, 91 S. Ct. at 1126 (an individual "must realize and risk that his companions may be reporting to the police").   As *White* explained, and the delegates confirmed, conversations are private only to the extent of the desire of the participants.   There is nothing which prevents an individual from relaying to police something he has heard another say.   While the Court is free to dispute the relative merits of U.S. Supreme Court decisions regarding the federal Constitution and the practice of electronic monitoring, it should not feel free to disregard our constitutional history.   The Constitutional Convention delegates did not intend the right to privacy to extend to telephone conversations involving the consent of one party, and their intention stands in stark contrast to the Court's holding today.

¶154   The Court's statement, that "citizenry of this state would not tolerate" "participant monitoring and recording of telephone conversations without a warrant, and, thus, subject only to the self-restraint of law enforcement," does not reflect the true issue.   Opinion, ¶¶ 56-57.   Police have never had "unchecked, warrantless" power to electronically monitor and record telephone conversations subject only to their "self-restraint."   We have long recognized the rule that police officers could intercept, transmit or record private conversations as long as one of the parties to the conversation consents.   *"This is true as long as the will of the consenting party has not been subjected to overbearing*

90

*pressure from the authorities*." *Hanley,* 186 Mont. at 419, 608 P.2d at 109 (emphasis added, citations omitted). Without the voluntary consent of a conversant, or a warrant, the police have never been free to monitor or record telephone conversations—precisely as the constitutional delegates intended.

¶155 The logical conclusion of the Court's reasoning is found in the position taken by the Concurrence that, in addition to the electronic recordings, the conversations between Golie and Allen should have been suppressed as well. Concurrence, ¶ 134. If the electronic monitoring and recording of Golie's conversation with Allen, notwithstanding Golie's consent, really constitutes a prohibited search under Article II, Sections 10 and 11 of the Montana Constitution, then the Concurrence is logically correct that the conversations themselves, in addition to the recordings, must also be suppressed as fruits of a warrantless, unconstitutional search. In my view, this illustrates, as a matter of logic, the ultimate difficulty of the *Goetz* rule and its extension here.

¶156 Therefore, upon the judgment of the U.S. Supreme Court in *White* and its progeny, this Court's precedent over the past 30 years, and the expressed intention of the delegates to the 1972 Montana Constitutional Convention, I would conclude that Article II, Sections 10 and 11 of the Montana Constitution are not violated when police electronically monitor and record telephone conversations with the voluntary consent of one of the parties, and would affirm the District Court's holding on this issue.

/S/ JIM RICE